# DUQUESNE LIGHT CO. ET AL. *v.* BARASCH ET AL.

No. 87–1160. Argued November 7, 1988—Decided January 11, 1989

300

*Peter Buscemi* argued the cause for appellants. With him on the briefs were *Alan L. Reed, William E. Zeiter, John F. Stillmun III, James R. Edgerly, Stephen L. Feld, Christine A. Hansen,* and *Larry R. Crayne.*

*Irwin A. Popowsky* argued the cause for appellees and filed a brief for appellee David M. Barasch. With him on the brief were *David M. Barasch, pro se,* and *Daniel Clearfield. Daniel P. Delaney, Bohdan R. Pankiw,* and *John A. Levin* filed a brief for appellee Pennsylvania Public Utility Commission.*

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

Pennsylvania law required that rates for electricity be fixed without consideration of a utility's expenditures for electrical generating facilities which were planned but never built, even though the expenditures were prudent and reasonable when made. The Supreme Court of Pennsylvania held that such a law did not take the utilities' property in violation of the Fifth Amendment to the United States Constitution. We agree with that conclusion, and hold that a

---

*Briefs of *amici curiae* urging reversal were filed for the Edison Electric Institute by *Robert L. Baum* and *Peter B. Kelsey;* and for the Pennsylvania Electric Association by *Rex E. Lee, David W. Carpenter, Vincent Butler,* and *David T. Evrard.*

Briefs of *amici curiae* urging affirmance were filed for the Consumer Federation of America et al. by *Scott Hempling* and *Roger Colton;* for the National Association of Regulatory Utility Commissioners by *William Paul Rodgers, Jr.;* for the National Association of State Utility Consumer Advocates by *Raymon E. Lark, Jr.;* and for the National Governor's Association et al. by *Benna Ruth Solomon, Joyce Holmes Benjamin, Beate Bloch,* and *Brian J. Moline.*

*H. Lee Roussell* and *David M. Kleppinger* filed a brief for Industrial Energy Consumers of Pennsylvania et al. as *amici curiae.*

state scheme of utility regulation does not "take" property simply because it disallows recovery of capital investments that are not "used and useful in service to the public." 66 Pa. Cons. Stat. § 1315 (Supp. 1988).

## I

In response to predictions of increased demand for electricity, Duquesne Light Company (Duquesne) and Pennsylvania Power Company (Penn Power) joined a venture in 1967 to build more generating capacity. The project, known as the Central Area Power Coordination Group (CAPCO), involved three other electric utilities and had as its objective the construction of seven large nuclear generating units. In 1980 the participants canceled plans for construction of four of the plants. Intervening events, including the Arab oil embargo and the accident at Three Mile Island, had radically changed the outlook both for growth in the demand for electricity and for nuclear energy as a desirable way of meeting that demand. At the time of the cancellation, Duquesne's share of the preliminary construction costs associated with the four halted plants was $34,697,389. Penn Power had invested $9,569,665.

In 1980, and again in 1981, Duquesne sought permission from the Pennsylvania Public Utility Commission (PUC)[1] to recoup its expenditures for the unbuilt plants over a 10-year period. The Commission deferred ruling on the request until it received the report from its investigation of the CAPCO construction. That report was issued in late 1982. The report found that Duquesne and Penn Power could not be faulted for initiating the construction of more nuclear generating capacity at the time they joined the CAPCO project in 1967. The projections at that time indicated a growing de-

---

[1] The PUC exercises a legislative grant of power to enforce the Pennsylvania public utilities laws. 66 Pa. Cons. Stat. § 501 (1986). "[T]he authority of the Commission must arise either from the express words of the pertinent statutes or by strong and necessary implication therefrom." *Philadelphia* v. *Philadelphia Electric Co.*, 504 Pa. 312, 317, 473 A. 2d 997, 999 (1984) (collecting cases).

mand for electricity and a cost advantage to nuclear capacity. It also found that the intervening events which ultimately confounded the predictions could not have been predicted, and that work on the four nuclear plants was stopped at the proper time. In summing up, the Administrative Law Judge found "that the CAPCO decisions in regard to the [canceled plants] at every stage to their cancellation, were reasonable and prudent." App. to Juris. Statement 19h. He recommended that Duquesne and Penn Power be allowed to amortize their sunk costs in the project over a 10-year period. The PUC adopted the conclusions of the report. App. to Juris. Statement 1i.

In 1982, Duquesne again came before the PUC to obtain a rate increase. Again, it sought to amortize its expenditures on the canceled plants over 10 years. In January 1983, the PUC issued a final order which granted Duquesne the authority to increase its revenues $105.8 million to a total yearly revenue in excess of $800 million. *Pennsylvania PUC* v. *Duquesne Light Co.*, 57 Pa. P. U. C. 1, 51 P. U. R. 4th 198 (1983). The rate increase included $3.5 million in revenue representing the first payment of the 10-year amortization of Duquesne's $35 million loss in the CAPCO plants.

The Pennsylvania Office of the Consumer Advocate (Consumer Advocate) moved the PUC for reconsideration in light of a state law enacted about a month before the close of the 1982 Duquesne rate proceeding. The Act, No. 335, 1982 Pa. Laws 1473, amended the Pennsylvania Utility Code by limiting "the consideration of certain costs in the rate base."[2] It

---

[2] Act 335 amended the Pennsylvania Utility Code by adding 66 Pa. Cons. Stat. § 1315. The relevant parts of Act 335 read as follows:
"AN ACT
"Amending Title 66 (Public Utilities) of the Pennsylvania Consolidated Statutes, providing *a limitation on the consideration of certain costs in the rate base* for electric public utilities.

. . . . .

"Section 1. Title 66 . . . is amended by adding a section to read:

provided that "the cost of construction or expansion of a facility undertaken by a public utility producing . . . electricity shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public." 66 Pa. Cons. Stat. § 1315 (Supp. 1988). On reconsideration, the PUC affirmed its original rate order. *Pennsylvania PUC v. Duquesne Light Co.*, 57 Pa. P. U. C. 177, 52 P. U. R. 4th 644 (1983). It read the new law as excluding the costs of canceled plants (obviously not used and useful) from the rate base, but not as preventing their recovery through amortization.

Meanwhile another CAPCO member, Penn Power, also sought to amortize its share of the canceled CAPCO power-plants over a 10-year period. The PUC granted Penn Power authority to increase its revenues by $15.4 million to a total of $184.2 million. *Pennsylvania PUC v. Pennsylvania Power Co.*, 58 Pa. P. U. C. 305, 60 P. U. R. 4th 593 (1984). Part of

---

"§ 1315. Limitation on consideration of certain costs for electric utilities.

"Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utilization of coal, *the cost of construction or expansion of a facility* undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity *shall not be made a part of the rate base nor otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public.* Except as stated in this section, no electric utility property shall be deemed used and useful *until it is presently providing actual utility service to the customers.*

"Section 2. This act shall be applicable to *all proceedings pending before the Public Utility Commission and the courts at this time.* Nothing contained in this act shall be construed to modify or change existing law with regard to rate making treatment of investment in facilities of fixed utilities other than electric facilities.

"Section 3. *This act shall take effect immediately.*

"APPROVED—The 30th day of December, A. D. 1982." (Emphasis added.)

that revenue increase represented $956,967 for the first year of the 10-year amortized recovery of Penn Power's costs in the aborted nuclear plants.

The Consumer Advocate appealed both of these decisions to the Commonwealth Court, which by a divided vote held that the Commission had correctly construed § 1315. *Cohen* v. *Pennsylvania PUC*, 90 Pa. Commw. 98, 494 A. 2d 58 (1985). The Consumer Advocate then appealed to the Supreme Court of Pennsylvania, and that court reversed. *Barasch* v. *Pennsylvania PUC*, 516 Pa. 142, 532 A. 2d 325 (1987). That court held that the controlling language of the Act prohibited recovery of the costs in question either by inclusion in the rate base or by amortization. The court rejected appellants' constitutional challenge to the statute thus interpreted, observing that "[t]he 'just compensation' safeguarded to a utility by the fourteenth amendment of the federal constitution is a reasonable return on the fair value of its property at the time it is being used for public service." *Id.*, at 163, 532 A. 2d, at 335. Since the instant CAPCO investment was not serving the public and did not constitute an operating expense, no constitutional rights to recovery attached to it. The court remanded to the PUC for further proceedings to correct its rate order, giving effect to the exclusion required by Act 335.[3] Duquesne and Penn Power appealed to this Court arguing that the effect of Act 335 excluding their prudently incurred costs from the rate violated the Takings Clause of the Fifth Amendment, applicable to the States under the Fourteenth Amendment. We noted probable jurisdiction. 485 U. S. 933 (1988).

---

[3] On October 10, 1985, too late to affect this case, the Pennsylvania Legislature enacted Act 1985–62 which added 66 Pa. Cons. Stat. § 520 (Supp. 1988) to the state utility code. Under § 520, the PUC is now authorized to permit amortized recovery of prudently incurred investment in canceled generating units.

## II

Although the parties have not discussed it, we must first inquire into our jurisdiction to decide this case. See *Jackson* v. *Ashton*, 8 Pet. 148 (1834); *Mansfield C. & L. M. R. Co.* v. *Swan*, 111 U. S. 379 (1884). Our jurisdiction here rests on 28 U. S. C. § 1257(2), which authorizes this Court to review "[f]inal judgments or decrees rendered by the highest Court of a State in which a decision could be had . . . [b]y appeal, where is drawn in question the validity of a statute of any state on the ground of its being repugnant to the Constitution . . . and the decision is in favor of its validity." Although this case has been remanded for further proceedings to revise the relevant rate orders, we hold that for purposes of our appellate jurisdiction the judgment of the Pennsylvania Supreme Court is final.

We have acknowledged that the words of § 1257(2) could well be interpreted to preclude review in this Court as long as any proceedings remain in state court. *Radio Station WOW, Inc.* v. *Johnson*, 326 U. S. 120, 124 (1945). In *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975), however, we recognized that in practice the final judgment rule has not been interpreted so strictly. *Cox* outlined four circumstances in which the adjudication of a federal issue in a case by the highest available state court had been reviewed in this Court notwithstanding the prospect of some further state-court proceedings.

This case falls into the first of the four categories. The Pennsylvania Supreme Court has finally adjudicated the constitutionality of Act 335 in the context of otherwise completed rate proceedings and so has left "the outcome of further proceedings preordained." *Cox, supra,* at 479. We do not think that the PUC might undo the effects of Act 335 on remand by allowing recovery of the disputed costs in some other way consistent with state law. The Pennsylvania Supreme Court's interpretation of the Act does not leave its

effect in doubt; the CAPCO related costs may not be "otherwise included in the rates charged." 66 Pa. Cons. Stat. § 1315 (1986).[4] We are satisfied that we are presented with the State's last word on the constitutionality of Act 335 and that all that remains is the straightforward application of its clear directive to otherwise complete rate orders. We therefore have jurisdiction. See *Cox, supra,* at 479; *Mills* v. *Alabama,* 384 U. S. 214 (1966).

### III

As public utilities, both Duquesne and Penn Power are under a state statutory duty to serve the public. A Pennsylvania statute provides that "[e]very public utility shall furnish and maintain adequate, efficient, safe, and reasonable service and facilities" and that "[s]uch service also shall be reasonably continuous and without unreasonable interruptions or delay." 66 Pa. Cons. Stat. § 1501 (1986). Although their assets are employed in the public interest to provide consumers of the State with electric power, they are owned and operated by private investors. This partly public, partly private status of utility property creates its own set of questions under the Takings Clause of the Fifth Amendment.

The guiding principle has been that the Constitution protects utilities from being limited to a charge for their property serving the public which is so "unjust" as to be confiscatory. *Covington & Lexington Turnpike Road Co.* v. *Sandford,* 164 U. S. 578, 597 (1896) (A rate is too low if it is "so unjust as to destroy the value of [the] property for all the purposes for which it was acquired," and in so doing "practi-

---

[4] As a result of recent legislation, this Court will not long have appellate jurisdiction over cases of the instant type. Public L. 100–352, 102 Stat. 662, effective September 25, 1988, and applicable to judgments rendered on or after that date, eliminates substantially all of our appellate jurisdiction, including § 1257(2). Persons aggrieved by state-court judgments should now file a petition for certiorari, rather than appeal. See S. Rep. No. 100–300 (1988); H. R. Rep. No. 100–660 (1988); B. Boskey & E. Gressman, The Supreme Court Bids Farewell to Mandatory Appeals, 109 S. Ct. LXXXI (1988).

cally deprive[s] the owner of property without due process of law"); *FPC* v. *Natural Gas Pipeline Co.*, 315 U. S. 575, 585 (1942) ("By long standing usage in the field of rate regulation, the 'lowest reasonable rate' is one which is not confiscatory in the constitutional sense"); *FPC* v. *Texaco Inc.*, 417 U. S. 380, 391–392 (1974) ("All that is protected against, in a constitutional sense, is that the rates fixed by the Commission be higher than a confiscatory level"). If the rate does not afford sufficient compensation, the State has taken the use of utility property without paying just compensation and so violated the Fifth and Fourteenth Amendments. As has been observed, however, "[h]ow such compensation may be ascertained, and what are the necessary elements in such an inquiry, will always be an embarrassing question." *Smyth* v. *Ames*, 169 U. S. 466, 546 (1898). See also *Permian Basin Area Rate Cases*, 390 U. S. 747, 790 (1968) ("[N]either law nor economics has yet devised generally accepted standards for the evaluation of rate-making orders").

At one time, it was thought that the Constitution required rates to be set according to the actual present value of the assets employed in the public service. This method, known as the "fair value" rule, is exemplified by the decision in *Smyth* v. *Ames*, *supra*. Under the fair value approach, a "company is entitled to ask . . . a fair return upon the value of that which it employs for the public convenience," while on the other hand, "the public is entitled to demand . . . that no more be exacted from it for the use of [utility property] than the services rendered by it are reasonably worth." 169 U. S., at 547. In theory the *Smyth* v. *Ames* fair value standard mimics the operation of the competitive market. To the extent utilities' investments in plants are good ones (because their benefits exceed their costs) they are rewarded with an opportunity to earn an "above-cost" return, that is, a fair return on the current "market value" of the plant. To the extent utilities' investments turn out to be bad ones (such as plants that are canceled and so never used and useful to

the public), the utilities suffer because the investments have no fair value and so justify no return.

Although the fair value rule gives utilities strong incentive to manage their affairs well and to provide efficient service to the public, it suffered from practical difficulties which ultimately led to its abandonment as a constitutional requirement.[5] In response to these problems, Justice Brandeis had advocated an alternative approach as the constitutional minimum, what has become known as the "prudent investment" or "historical cost" rule. He accepted the *Smyth* v. *Ames* eminent domain analogy, but concluded that what was "taken" by public utility regulation is not specific physical assets that are to be individually valued, but the capital prudently devoted to the public utility enterprise by the utilities' owners. *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 291 (1923) (dissenting opinion). Under the prudent investment rule, the utility is compensated for all prudent investments at their actual cost when made (their "historical" cost), irrespective of whether individual investments are deemed necessary or beneficial in hindsight. The utilities incur fewer risks, but are limited to a standard rate of return on the actual amount of money reasonably invested.[6]

---

[5] Perhaps the most serious problem associated with the fair value rule was the "laborious and baffling task of finding the present value of the utility." *Missouri ex rel. Southwestern Bell Telephone Co.* v. *Public Service Comm'n,* 262 U. S. 276, 292–294 (1923) (Brandeis, J. dissenting). The exchange value of a utility's assets, such as powerplants, could not be set by a market price because such assets were rarely bought and sold. Nor could the capital assets be valued by the stream of income they produced because setting that stream of income was the very object of the rate proceeding. According to Brandeis, the *Smyth* v. *Ames* test usually degenerated to proofs about how much it would cost to reconstruct the asset in question, a hopelessly hypothetical, complex, and inexact process. 262 U. S., at 292–294.

[6] The system avoids the difficult valuation problems encountered under the *Smyth* v. *Ames* test because it relies on the actual historical cost of investments as the basis for setting the rate. The amount of a utility's

Forty-five years ago in the landmark case of *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591 (1944), this Court abandoned the rule of *Smyth* v. *Ames*, and held that the "fair value" rule is not the only constitutionally acceptable method of fixing utility rates. In *Hope* we ruled that historical cost was a valid basis on which to calculate utility compensation. 320 U. S., at 605 ("Rates which enable [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so called 'fair value' rate base"). We also acknowledged in that case that all of the subsidiary aspects of valuation for ratemaking purposes could not properly be characterized as having a constitutional dimension, despite the fact that they might affect property rights to some degree. Today we reaffirm these teachings of *Hope Natural Gas:* "[I]t is not theory but the impact of the rate order which counts. If the total effect of the rate order cannot be said to be unreasonable, judicial inquiry . . . is at an end. The fact that the method employed to reach that result may contain infirmities is not then important." *Id*, at 602. This language, of course, does not dispense with all of the constitutional difficulties when a utility raises a claim that the rate which it is permitted to charge is so low as to be confiscatory: whether a particular rate is "unjust" or "unreasonable" will depend to some extent on what is a fair rate of return given the risks under a particular rate-setting system, and on the amount of capital upon which the investors are entitled to earn that return. At the margins, these questions have constitutional overtones.

Pennsylvania determines rates under a slightly modified form of the historical cost/prudent investment system.[7] Nei-

---

actual outlays for assets in the public service is more easily ascertained by a ratemaking body because less judgment is required than in valuing an asset.

[7] Pennsylvania values property in the rate base according to its historical cost. As provided by 66 Pa. Cons. Stat. § 1311(b) (1986), "[t]he value

ther Duquesne nor Penn Power alleges that the total effect of the rate order arrived at within this system is unjust or unreasonable. In fact the overall effect is well within the

---

of the property of the public utility included in the rate base shall be the original cost of the property when first devoted to the public service less the applicable accrued depreciation." Accordingly, the PUC declared in Duquesne's rate proceeding that "we shall adopt as the fair value of the respondent's rate base, the original cost measure of value." *Pennsylvania PUC* v. *Duquesne Light Co.*, 57 Pa. P. U. C. 1, 5, 51 P. U. R. 4th 198, 202 (1983). It held likewise in Penn Power's case. See *Pennsylvania PUC* v. *Pennsylvania Power Co.*, 58 Pa. P. U. C. 305, 310, 60 P. U. R. 4th 593, 597 (1984) (same).

Having adjusted the historical cost in various ways to account for such things as depreciation and working capital, the PUC proceeds to set a rate of return based largely on the cost of capital to the enterprise. The cost of each component of the utility's capital is considered, *i. e.*, "the cost of debt, the cost of preferred stock, and the cost of common stock[,] [t]he latter being determined by the return required to sell such stock upon reasonable terms in the market." *Pennsylvania PUC* v. *Duquesne Light Co.*, *supra*, at 42, 51 P. U. R. 4th, at 235; *Bluefield Water Works & Improvement Co.* v. *Public Service Comm'n of West Virginia*, 262 U. S. 679, 692–693 (1923). It then exercises "informed judgment" to set the total rate of return based on these component costs of capital. *Ibid.* See also *Pennsylvania PUC* v. *Pennsylvania Power*, *supra*, at 325–326, 60 P. U. R. 4th, at 611–621.

The bulk of the rate based on capital, then, represents a return (set by costs of capital) on a rate base (determined by historical cost). These are features of the historical cost/prudent investment system. Pennsylvania has modified the system in several instances, however, when prudent investments will never be used and useful. For such occurrences, it has allowed amortization *of* the capital lost, but does not allow the utility to earn a return *on* that investment. See, *e. g.*, *Pennsylvania PUC* v. *Metropolitan Edison Co.*, 55 Pa. P. U. C. 478, 486 (1982) (amortization of company's investment in contaminated Three Mile Island Unit 2); *Philadelphia Electric Co.* v. *Pennsylvania PUC*, 61 Pa. Commw. 325, 433 A. 2d 620 (1981) (excluding from the rate base a portion of a utility's generating plant that was excess capacity, but allowing recovery of the operating expenses, including depreciation charges on the entire plants); *UGI Corp.* v. *Pennsylvania PUC*, 49 Pa. Commw. 69, 410 A. 2d 923 (1980) (permitting amortization of terminated feasibility studies); *Pennsylvania PUC* v. *Philadelphia Electric Co.*, 46 Pa. P. U. C. 746, 750 (1973) (10-year amortization of unusual expenses caused by tropical storm). The loss to utilities from prudent but ultimately unsuccessful investments under such a system is

bounds of *Hope*, even with total exclusion of the CAPCO costs. Duquesne was authorized to earn a 16.14% return on common equity and an 11.64% overall return on a rate base of nearly $1.8 billion. See *Pennsylvania PUC* v. *Duquesne Light Co.*, 57 Pa. P. U. C., at 51, 51 P. U. R. 4th, at 243. Its $35 million investment in the canceled plants comprises roughly 1.9% of its total base. The denial of plant amortization will reduce its annual allowance by 0.4%. Similarly, Penn Power was allowed a charge of 15.72% return on common equity and a 12.02% overall return. Its investment in the CAPCO plants comprises only 2.4% of its $401.8 million rate base. See *Pennsylvania PUC* v. *Pennsylvania Power Co.*, 58 Pa. P. U. C., at 331–332, 60 P. U. R. 4th, at 618. The denial of amortized recovery of its $9.6 million investment in CAPCO will reduce its annual revenue allowance by only 0.5%.

Given these numbers, it appears that the PUC would have acted within the constitutional range of reasonableness if it had allowed amortization of the CAPCO costs but set a lower rate of return on equity with the result that Duquesne and Penn Power received the same revenue they will under the instant orders on remand. The overall impact of the rate orders, then, is not constitutionally objectionable. No argument has been made that these slightly reduced rates jeopardize the financial integrity of the companies, either by leaving them insufficient operating capital or by impeding their ability to raise future capital. Nor has it been demonstrated that these rates are inadequate to compensate current equity holders for the risk associated with their investments under a modified prudent investment scheme.[8]

greater than under a pure prudent investment rule, but less than under a fair value approach. Pennsylvania's modification slightly increases the overall risk of investments in utilities over the pure prudent investment rule. Presumably the PUC adjusts the risk premium element of the rate of return on equity accordingly.

[8] Duquesne's embedded cost of debt was 9.42%. *Pennsylvania PUC* v. *Duquesne Light Co.*, 57 Pa. P. U. C., at 44, 51 P. U. R. 4th, at 237. Penn

Instead, appellants argue that the Constitution requires that subsidiary aspects of Pennsylvania's ratemaking methodology be examined piecemeal. One aspect which they find objectionable is the constraint Act 335 places on the PUC's decisions. They urge that such legislative direction to the PUC impermissibly interferes with the PUC's duty to balance consumer and investor interest under *Permian Basin*, 390 U. S., at 792. Appellants also note the theoretical inconsistency of Act 335, suddenly and selectively applying the used and useful requirement, normally associated with the fair value approach, in the context of Pennsylvania's system based on historical cost. Neither of the errors appellants perceive in this case is of constitutional magnitude.

It cannot seriously be contended that the Constitution prevents state legislatures from giving specific instructions to their utility commissions. We have never doubted that state legislatures are competent bodies to set utility rates. And the Pennsylvania PUC is essentially an administrative arm of the legislature. See, *e. g.*, *Barasch* v. *Pennsylvania PUC*, 516 Pa., at 171, 532 A. 2d, at 339 ("The Commission is but an instrumentality of the state legislature for the performance of [ratemaking]"); *Minnesota Rate Cases*, 230 U. S. 352, 433 (1913) ("The rate-making power is a legislative power and necessarily implies a range of legislative discretion").[9] We stated in *Permian Basin* that the commission "must be free, within the limitations imposed by pertinent constitutional

---

Power's debt service was at 10.25%. *Pennsylvania PUC* v. *Pennsylvania Power Co.*, 58 Pa. P. U. C., at 332, 60 P. U. R. 4th, at 618.

[9] Indeed, the issue of constitutional concern has usually been just the reverse of appellants' objection. Challenges to state and federal laws have been raised on the ground that the legislatures have delegated too much authority and discretion. See *J. W. Hampton, Jr., & Co.* v. *United States*, 276 U. S. 394 (1928) (federal delegation of authority to set import tariff rates); *York R. Co.* v. *Driscoll*, 331 Pa. 193, 200 A. 864 (1938) (PUC's authorization to exempt utility securities from reporting and registration requirements an unconstitutional delegation of legislative power under Pennsylvania Constitution because it allowed the utility to nullify the statutory reporting requirements).

and *statutory commands*, to devise methods of regulation capable of equitably reconciling diverse and conflicting interests." 390 U. S., at 767 (emphasis added). This is not to say that any system of ratemaking applied by a utilities commission, including the specific instructions it has received from its legislature, will necessarily be constitutional. But if the system fails to pass muster, it will not be because the legislature has performed part of the work.

Similarly, an otherwise reasonable rate is not subject to constitutional attack by questioning the theoretical consistency of the method that produced it. "It is not theory, but the impact of the rate order which counts." *Hope*, 320 U. S., at 602. The economic judgments required in rate proceedings are often hopelessly complex and do not admit of a single correct result. The Constitution is not designed to arbitrate these economic niceties. Errors to the detriment of one party may well be canceled out by countervailing errors or allowances in another part of the rate proceeding. The Constitution protects the utility from the net effect of the rate order on its property. Inconsistencies in one aspect of the methodology have no constitutional effect on the utility's property if they are compensated by countervailing factors in some other aspect.

Admittedly, the impact of certain rates can only be evaluated in the context of the system under which they are imposed. One of the elements always relevant to setting the rate under *Hope* is the return investors expect given the risk of the enterprise. *Id.*, at 603 ("[R]eturn to the equity owner should be commensurate with returns on investments in other enterprises having corresponding risks"); *Bluefield Water Works & Improvement Co.* v. *Public Service Comm'n of West Virginia*, 262 U. S. 679, 692–693 (1923) ("A public utility is entitled to such rates as will permit it to earn a return . . . equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by

corresponding risks and uncertainties"). The risks a utility faces are in large part defined by the rate methodology because utilities are virtually always public monopolies dealing in an essential service, and so relatively immune to the usual market risks. Consequently, a State's decision to arbitrarily switch back and forth between methodologies in a way which required investors to bear the risk of bad investments at some times while denying them the benefit of good investments at others would raise serious constitutional questions. But the instant case does not present this question. At all relevant times, Pennsylvania's rate system has been predominantly but not entirely based on historical cost and it has not been shown that the rate orders as modified by Act 335 fail to give a reasonable rate of return on equity given the risks under such a regime. We therefore hold that Act 335's limited effect on the rate order at issue does not result in a constitutionally impermissible rate.

Finally we address the suggestion of the Pennsylvania Electric Association as *amicus* that the prudent investment rule should be adopted as the constitutional standard. We think that the adoption of any such rule would signal a retreat from 45 years of decisional law in this area which would be as unwarranted as it would be unsettling. *Hope* clearly held that "the Commission was not bound to the use of any single formula or combination of formulae in determining rates." 320 U. S. at 602. More recently, we upheld the Federal Power Commission's departure from the individual producer cost-of-service (prudent investment) system. In *Wisconsin* v. *FPC*, 373 U. S. 294 (1963), the FPC had concluded after extensive hearings that "the individual company cost-of-service method, based on theories of original cost and prudent investment, was not a workable or desirable method for determining the rates of independent producers and that the 'ultimate solution' lay in what has become to be known as the area rate approach: 'the determination of fair prices . . . based on reasonable financial requirements of the industry.'"

*Id.*, at 298–299. In upholding the FPC's area rate methodology against the argument that the individual company prudent investment rule was constitutionally required, the Court observed:

> "[T]o declare that a particular method of rate regulation is so sanctified as to make it highly unlikely that any other method could be sustained would be wholly out of keeping with this Court's consistent and clearly articulated approach to the question of the Commission's power to regulate rates. It has repeatedly been stated that no single method need be followed by the Commission in considering the justness and reasonableness of rates." *Id.*, at 309 (collecting cases).

See also *FPC* v. *Texaco Inc.*, 417 U. S. at 387–390.

The adoption of a single theory of valuation as a constitutional requirement would be inconsistent with the view of the Constitution this Court has taken since *Hope Natural Gas*, *supra*. As demonstrated in *Wisconsin* v. *FPC*, circumstances may favor the use of one ratemaking procedure over another. The designation of a single theory of ratemaking as a constitutional requirement would unnecessarily foreclose alternatives which could benefit both consumers and investors.[10] The Constitution within broad limits leaves the States free to decide what ratesetting methodology best meets their needs in balancing the interests of the utility and the public.

*Affirmed.*

---

[10] For example, rigid requirement of the prudent investment rule would foreclose hybrid systems such as the one Pennsylvania used before the effective date of Act 335 and now uses again. See n. 4, *supra*. It would also foreclose a return to some form of the fair value rule just as its practical problems may be diminishing. The emergent market for wholesale electric energy could provide a readily available objective basis for determining the value of utility assets.

JUSTICE SCALIA, with whom JUSTICE WHITE and JUSTICE O'CONNOR join, concurring.

I join the Court in reaffirming our established rule that no single ratemaking methodology is mandated by the Constitution, which looks to the consequences a governmental authority produces rather than the techniques it employs. See, e. g., *FPC* v. *Texaco Inc.*, 417 U. S. 380, 387–390 (1974); *Wisconsin* v. *FPC*, 373 U. S. 294, 309 (1963); *FPC* v. *Hope Natural Gas Co.*, 320 U. S. 591, 602 (1944). I think it important to observe, however, that while "prudent investment" (by which I mean capital reasonably expended to meet the utility's legal obligation to assure adequate service) need not be taken into account as such in ratemaking formulas, it may need to be taken into account in assessing the constitutionality of the particular consequences produced by those formulas. We cannot determine whether the payments a utility has been allowed to collect constitute a fair return on investment, and thus whether the government's action is confiscatory, unless we agree upon what the relevant "investment" is. For that purpose, all prudently incurred investment may well have to be counted. As the Court's opinion describes, that question is not presented in the present suit, which challenges techniques rather than consequences.

JUSTICE BLACKMUN, dissenting.

The Court, I fear, because of what it regards as the investment of time in having this case argued and briefed, is strong-arming the finality concept and finding a *Cox* exception that does not exist. We have jurisdiction, under 28 U. S. C. § 1257, only if there is a "final judgment" by the "highest court of a State" in which a decision could be had. To be sure, we have interpreted § 1257 somewhat flexibly to the effect that the finality requirement is satisfied in four discrete situations despite the need of further proceedings in the state courts: *Cox Broadcasting Corp.* v. *Cohn*, 420 U. S. 469, 477 (1975).

The Court here concludes that this case falls within the first of the four *Cox* exceptions ("the outcome of further proceedings preordained," *id.*, at 479). With all respect, I disagree, for this case concerns rates, and there is no rate order whatsoever before this Court. The Supreme Court of Pennsylvania invalidated the rate orders set by the Pennsylvania Commission, and remanded the cases for further ratemaking. The Court deludes itself when it speaks of preordination of the Commission's further action. New rates will be set, based upon factors we do not as yet know, and only then will a final judgment possibly emerge in due course.

I therefore would dismiss the appeal for want of the final judgment that § 1257 requires.