The Honorable Carl Holmes State Representative, One Hundred Twenty-Fifth District P.O. Box 2288 Liberal, Kansas 67905
Dear Representative Holmes:
As representative for the one hundred twenty-fifth district you inquire about the legitimacy of 1994 house bill no. 3039, a/k/a TeleKansas II. Specifically you ask whether the legislature has the authority to require the Kansas corporation commission (KCC) to condition the extension of TeleKansas I (Docket No. 166, 856-U) upon "the continuation of current levels of employment in this state as of April 1, 1994," thereby requiring the KCC to prescribe the utility company's level of employment.
1994 house bill no. 3039 provides, in part:
 "Sec. 2. (a) The Kansas corporation commission, for a period extending through March 1, 1997, shall continue to regulate all telecommunications public utilities with more than 500,000 access lines in accordance with the terms and conditions set forth in TeleKansas I. The continuation shall include: (1) Capital expenditures, above normal construction investment, of not less than $64,000,000 by such telecommunications public utilities in a manner and amount to be determined by agreement between such telecommunications public utilities and the corporation commission and (2) the continuation of current levels of employment in this state through March 1, 1997 based on employment in this state as of April 1, 1994. The commission may require such additional investments and commitments so that the overall terms and conditions are no less favorable than those which have been publicly offered by such utility in states contiguous to Kansas during the six months prior to the effective date of this act. Such additional capital expenditures shall include but not be limited to the completion of a fiber optic network for public high schools in areas served by Southwestern Bell in Kansas. The corporation commission shall monitor each approved project and the expenditures therefore. The commission shall not conduct any earnings audit for the purpose of requiring rate reductions prior to January 1, 1996.
 "(b) Nothing in this section shall prevent the corporation commission from further relaxing regulation of telecommunications services, from authorizing competition in existing services or entry of new competitive services, or from complying with preemptive federal orders prior to March 1, 1997. With the exception of subdivision (a), this section does not otherwise alter the commission's statutory authority.
 "(c) For purposes of this section, `TeleKansas I' means the scheme of regulation set forth in the corporation commission's February 2, 1990 order in the case styled In the Matter of Southwestern Bell Telephone Company's Proposal for Network Modernization, Rate Stability and Pricing Regulation, a/k/a `TeleKansas,' docket number 166,856-U."
The provisions of this bill clearly alter the commission's present statutory authority by providing a specific order rather than general guidelines for the KCC to follow. See Colorado Interstate Gas Co. v.State Corporation Comm'n, 192 Kan. 2, 12 (1963) (whether a particular determination is an order is determined by its substance and not by its label). The legislature may provide such an order because public utility rate making is a legislative function regardless of whether the utility is regulated by an administrative body or by the legislature itself.Kansas Gas Electric Co. v. Kansas Corporation Comm'n, 239 Kan. 483, 491
(1986); 64 Am.Jur.2d Public Utilities, secs. 89, 240 (1972).
At issue is whether the prescribing of a certain level of employment in the legislative rate order amounts to a taking of property without due compensation in violation of the takings clause of the 5th amendment of the United States constitution, made applicable to the state under the 14th amendment. Generally, in the exercise of its police power the legislature may intrude in the management of a public utility to the extent public interests demands. 64 Am.Jur.2d Public Utilities sec. 9 (1972). The authority to regulate public utilities is, however, not without parameters; the power must be exercised within the confines of constitutional protections and legal principles established by caselaw in the area. Kan. Const., art. 2, sec. 1; Duquesne Light Co. v. Barasch,488 U.S. 299, 313, 109 S.Ct. 609, 618, 102 L.Ed.2d 646, 661 (1989); Statev. Johnson, 61 Kan. 803, 816 (1900); 64 Am.Jur.2d Public Utilities sec. 133 (1972). Smith v. State Highway Comm'n, 185 Kan. 445, 453 (1959). In other words if the regulation and control of a public utility is to be reasonable and not amount to a taking of property, the regulation and control cannot extend beyond constitutional and legal principles applicable to rate-making decisions. Southwestern Bell Tele. Co. v. StateCorporation Commission, 192 Kan. 39 (1963), 64 Am.Jur.2d PublicUtilities sec. 191 (1972).
The leading case in the area, Power Comm'n v. Hope Gas Co., 320 U.S. 591,64 S.Ct. 281, 88 L.Ed. 333 (1944) has been explained and consistently followed by our highest court. In Kansas Gas and Electric Co. v. KansasCorporation Comm'n, 239 Kan. 483 (1986) the Kansas Supreme Court explains the legal standard established by Hope:
 "In applying the standard requiring `just and reasonable' rates, the Hope court emphasized that the focus of inquiry is properly upon the end result or `total effect' of the rate order, rather than upon the rate-setting method employed. The court described the ratesetting process as a balancing process involving the weighing of certain enumerated interests of the consumer and of the investor." 239 Kan. at 489.
The standard in Hope requires that the focus of the inquiry be on the total effect of the rate order on the utility's property, not on the method used to produce the effect. In the application of this standard there is no constitutional effect on the utility's property if there are countervailing factors that compensate the utility in some respect.Duquesne, 488 U.S. 299, 314, 109 S.Ct. 609, 618, 102 L.Ed.2d 646, 661
(1989). Whether there is a constitutionally challengeable consequence is a factual question, dependent on the facts in each particular case. 64 Am.Jur.2d Public Utilities sec. 191 (1972). Southwestern Bell Tele. Co.v. State Corporation Commission, 192 Kan. 39, 47 (1963). It is thus necessary to consider your inquiry in light of the actual effect of the utility's situation and opportunities.
The legislative rate order prescribing the level of employment is compensated by the KCC's refrain from "conduct[ing] any earnings audit for the purpose of requiring rate reductions prior to January 1, 1996." 1994 H.B. No. 3039, sec. 2(a). The costs attributable to maintaining the prescribed level of employment in accordance with the legislative rate order is balanced or offset by the guarantee that the rates will not be lowered as a result of an audit of the utility's property and further offset by the KCC's authority to engage in "further relaxing regulation of telecommunication services," section 2(b).
Interested parties have argued that there appear to be theoretical inconsistencies between the legislative regulatory rate scheme authorizing the KCC to require a public utility to furnish reasonably efficient and sufficient service in order to maintain just and reasonable rates (K.S.A. 66-101b), and the rate-making relaxed regulatory scheme in question providing a set rate that is presumed reasonable and relinquishing authority to perform audit earnings for purposes of rate reductions. See Order, Appendix "A", p. 2, 9. These theoretical inconsistencies are not subject to constitutional challenge or even subject to judicial inquiry unless the resulting effect or "total effect" under the particular circumstances fixes rates or results in governmental action that is confiscatory. See Hope, ibid. and Duquesne, ibid. The legislature under this standard is thus free to determine what costs are reasonable and subject to recovery from the captive ratepayer. The legislature may utilize any methodology or technique it chooses, including one that changes the present regulatory scheme. 64 Am.Jur.2dPublic Utilities sec. 9 (1972).
In conclusion it is our opinion that the consequences of prescribing a certain level of employment does not under these circumstances result in a confiscatory net effect and thus is not subject to constitutional challenge under the takings clause of the 5th amendment.
Your second question is twofold; you inquire whether the investment provisions in the legislation are unconstitutionally vague and if not, whether the KCC's authority has any limitations under these provisions. Generally a challenge of vagueness is made against criminal statutes and is determined by whether the statute's language conveys a sufficient warning as to the proscribed conduct. Boatwright v. Kansas RacingComm'n, 251 Kan. 240, 245 (1992). The criminal standard of review is not relevant to our inquiry because the statute does not involve criminal liabilities. Our inquiry is afforded greater leeway because the statute regulates business rather than proscribes criminal conduct. GuardianTitle Co. v. Bell, 248 Kan. 146, 150 (1990) citing In Re Brooks,228 Kan. 541, 544 (1980). The investment provisions in the statute are thus subject only to a common sense determination of fairness that inquires whether an ordinary person exercising common sense can understand and comply with the statute's terms. Guardian, ibid. The standard is all but lost in its application to our facts. The investment provisions are part of a statute directed at an agency that has vast expertise and discretion in the complex field of public utility regulation. See K.S.A. 66-1,192, as amended by 1994 H.B. No. 2665. The statute in question directs the KCC to execute the legislature's directives by relaxing regulation and by requiring a quid pro quo from the utility company. See Kansas Gas Electric Co. v. KansasCorporation Comm'n, 239 Kan. 483, 395 (1986) (discussing the KCC's expertise); Guardian Title Co. v. Bell, 248 Kan. 146, 154 (1991) (the character of an administrative agency is important in determining whether adequate standards have been provided by the legislature). In our judgment the investment provisions requiring expenditures of not less than $64 million "in a manner and amount to be determined by agreement" does not lend itself to a challenge for vagueness given the KCC's broad statutory discretion. See generally K.S.A. 66-1,189; 66-1,191; 66-1,194; 66-101b; 66-128b.
Your last question is whether the legislative directives found in 1994 H.B. no. 3039 impose any limitations on the KCC's authority. The legal issue presented by your question is whether the bill contains reasonably clear standards to control the KCC's exercise of authority and avoid a challenge based on unlawful delegation of legislative authority. Whether clear standards are fixed and serve to limit the KCC's authority is a question of fact given the parameters of the KCC's statutory authority generally (K.S.A. 66-104 et seq. 66-1,187 et seq.), and given how the legislation in question alters the KCC's statutory authority. We must for this reason review the bill within the terms of the order it incorporates.
1994 house bill no. 3039 incorporates the terms and conditions set forth in TeleKansas I and provides other conditions to be met. The additional conditions that are the subject of your inquiry cannot be reviewed outside the provisions of TeleKansas I because this agreement forms the foundation of the additional requirements or provisions. The alternative regulatory approach from rate base regulation to pricing regulation proposed by Southwestern Bell (Order, p. 11) was subject to a gamut of prehearing conferences, public hearings and evidentiary hearings, and it also involved many interested parties. The KCC issued an extensive order setting forth the parties' stipulations and making other extensive findings of fact and conclusions of law that prevents arbitrary action and provides a record to facilitate judicial review.
In this context, 1994 house bill no. 3039 authorizes the KCC the discretion to
 "require such additional investments and commitments so that the overall terms and conditions are no less favorable than those which have been publicly offered by such utility in states contiguous to Kansas during the six months prior to the effective date of this act."
The legislative directive is specific in requiring a comparison with surrounding states. Setting a cap at not less than $64,000 the legislature specifically authorizes negotiations with the telecommunication public utility on the manner and amount of capital expenditures, above normal investment. The KCC in order to use the discretion (found in the language quoted above) must make more findings of fact and set conditions as required by the legislature. See Guardian,248 Kan. at 154 (the modern trend is to require less detailed standards in areas of complex problems); State, ex rel., v. Fadely, 180 Kan. 652, 663
(1957). In our judgment 1994 house bill no. 3039, when considered in its proper context, has sufficient guidelines and limitations and is not subject to a challenge based on unlawful delegation of legislative authority.
In summary, we find that rate making is a legislative function which necessarily implies a range of legislative discretion. Within this discretion lies the authority to prescribe specific conditions in a rate order such as the conditions found in 1994 house bill no. 3039.
Very truly yours,
 ROBERT T. STEPHAN Attorney General of Kansas
 Guen Easley Assistant Attorney General
RTS:JLM:GE:jm