NOT DESIGNATED FOR PUBLICATION

No. 115,284

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

TWIN VALLEY TELEPHONE, INC.,
*Petitioner*,

v.

THE STATE CORPORATION COMMISSION OF THE
STATE OF KANSAS,
*Respondent*.

MEMORANDUM OPINION

Appeal from Kansas Corporation Commission. Opinion filed June 17, 2016. Affirmed.

*Thomas E. Gleason, Jr.*, and *Mark Doty*, of Gleason & Doty, Chtd., of Lawerence, for petitioner.

*Dustin L. Kirk*, special assistant attorney general, of Kansas Corporation Commission, of Topeka, for respondent.

Before ATCHESON, P.J., STANDRIDGE and POWELL, JJ.

*Per Curiam*: Twin Valley Telephone, Inc., has appealed a ruling of the Kansas Corporation Commission rejecting the company's request for a significantly enhanced government subsidy to offset the cost of providing landline services to about 5,000 customers in the north central part of the state. Twin Valley has presented no legally persuasive argument the KCC erred. The KCC's order conforms to a legislative directive in K.S.A. 2015 Supp. 66-2008(e)(2) that state subsidies not be used to replace reductions in federal subsidies, and the decision does not constitutionally take Twin Valley's

1

property without just compensation. We, therefore, affirm the agency action denying the requested subsidy.

FACTUAL BACKGROUND

We dispense with any extended discussion of the evolution of the telecommunications industry over the past two decades and the interplay of state and federal regulation of that industry, including various price supports and subsidies to encourage both technological advances and provision of reasonably priced services to otherwise economically unattractive customers. Although that history provides a backdrop to the issue before us, it is neither integral to nor determinative of the proper resolution. A mere sliver of that complex regulatory scheme figures in this case. The curious may find *Bluestem Telephone Co. v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 96, 363 P.3d 1115 (2015), and *In re FCC 11-161*, 753 F.3d 1015 (10th Cir. 2014), useful portals to the acronym-laden historical story.

More pertinent here, Twin Valley provides traditional telephone service to rural customers in a limited geographical area. In doing so, Twin Valley has agreed to operate as a publicly regulated enterprise providing a high quality service at a reasonable cost to customers who would otherwise face the prospects of having no available landline telephones or paying excessively steep rates for them. As with other companies operating in the public interest subject to substantial government regulation, Twin Valley is permitted to earn a reasonable rate of return for its shareholders. See *Southwestern Bell Tel. Co. v. State Corporation Commission*, 192 Kan. 39, 60-61, 386 P.2d 515 (1963); *Kansas City Power & Light Co. v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 514, 542-43, ___ P.3d ___ (2016); *Moundridge Telephone Co. v. Kansas Corporation Comm'n*, No. 114,064, 2015 WL 7693784, at *15 (Kan. App. 2015) (unpublished opinion), *rev. denied* 304 Kan. ___ (2016). The KCC oversees the intrastate regulation of

2

telephone and other telecommunication service providers, including Twin Valley, and reviews rate requests and other aspects of their financial operations.

Historically, the federal government has provided various economic incentives, including subsidies, to companies providing landline telephone service to underserved or difficult-to-serve populations to offset the high capital outlay and continuing costs of reaching those groups. Government policymakers and regulators at the state and federal levels concluded that in a purely free-market model those customers would not be served at all or would face some combination of exorbitant rates and inferior services. Consistent with federal law, the Kansas Legislature has established the Kansas Universal Service Fund (KUSF) to augment available federal subsidies. K.S.A. 2015 Supp. 66-2008. As part of its charge, the KCC also regulates the KUSF. Twin Valley has received and continues to receive KUSF subsidies. This case is about how much the company should get.

Telecommunications carriers, telecommunications public utilities, and wireless service providers offering intrastate services in Kansas contribute to the KUSF and may recoup those contributions through the rates they charge their customers. K.S.A. 2015 Supp. 66-2008(a). In effect, the customers of otherwise profitable telecommunications providers contribute to a pool that helps reduce the cost of landline telephone service available to rural customers through carriers such as Twin Valley.

Over the last 5 years, the federal government has revamped its telecommunications regulations and subsidies to provide greater economic incentives for broadband and internet with a concomitant reduction in financial support for landline telephone service. In 2013, the Kansas Legislature modified the statutes governing the KUSF to significantly curtail the allocation of those monies to make up for lost federal subsidies. K.S.A. 2015 Supp. 66-2008(e)(2).

3

As a result of the federal recalibration, Twin Valley lost High Cost Loop subsidies, one form of federal financial support. In 2014, Twin Valley asked the KCC to authorize a substantially larger subsidy from the KUSF as a result. The KCC audited Twin Valley to assess the financial need for and legal appropriateness of the requested increase. Following the audit, the KCC received extensive written testimony and documentary evidence from its staff and from Twin Valley. The KCC issued an order approving an increase of about $13,000 in KUSF support to Twin Valley not directly connected to lost federal High Cost Loop subsidies and denying an increase of $856,627 specifically to offset that loss. Twin Valley has appealed the KCC's order and challenges the denial of the additional $856,627 in KUSF subsidies. We understand that Twin Valley continues to receive several million dollars a year from the KUSF—payments that are not at issue in this dispute.

LEGAL ANALYSIS

We consider KCC orders under the Kansas Judicial Review Act (KJRA), K.S.A. 2015 Supp. 77-601 *et seq.* Twin Valley, therefore, has the burden to show a material error in the KCC's decision. K.S.A. 2015 Supp. 77-621(a)(1). The KJRA outlines the specific grounds on which a court may set aside an agency determination, including errors of law, unsupported factual findings, and constitutional defects. K.S.A. 2015 Supp. 77-621(c). If an issue turns on an interpretation of a statute or some other question of law, we review without deference to the agency's legal analysis. *Redd v. Kansas Truck Center*, 291 Kan. 176, 187-88, 239 P.3d 66 (2010); *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). Judicial review is more limited when an agency's findings of fact have been challenged. A reviewing court may reject a factual finding only if it lacks substantial support in the evidence considering "the record as a whole" in light of the governing standard of proof. K.S.A. 77-621(c)(7).

4

For its first point on appeal, Twin Valley questions an accounting device the KCC staff used to comply with the statutory limitation on the KUSF imposed in K.S.A. 2015 Supp. 66-2008(e)(2). The statute, in pertinent part, requires:

"Notwithstanding any other provision of law, no KUSF support received by a local exchange carrier electing pursuant to subsection (b) of K.S.A. 66-2005, and amendments thereto, to operate under traditional rate of return regulation shall be used to offset any loss of federal universal service fund support for such carrier, except that such limitation on KUSF support shall not preclude recovery of reductions in intrastate access revenue pursuant to subsection (c) of K.S.A. 66-2005, and amendments thereto." K.S.A. 2015 Supp. 66-2008(e)(2).

Basically, the legislature prohibited use of the KUSF to make up for the loss of federal subsidies to local telephone carriers that have chosen to be regulated through a traditional rate-of-return model. Twin Valley indisputably is such a carrier. The statute contains a narrow exception allowing the KUSF to replace reductions in intrastate access revenue. The exception, however, does not apply to cuts in federal High Cost Loop subsidies.

For purposes of the audit, the KCC staff treated the amount by which the High Cost Loop subsidy was reduced as if Twin Valley had actually received that money from the federal government. In other words, the staff considered the change in the High Cost Loop payment as revenue or a plus rather than as a loss or a negative. According to the staff, to do otherwise would result in a violation of K.S.A. 2015 Supp. 66-2008(e)(2) because the calculation of the KUSF subsidy due Twin Valley would include an amount offsetting the loss of that federal subsidy.

On appeal, Twin Valley doesn't really dispute the KCC's reasoning and offers no alternative accounting method that would better or more fairly accommodate the dictates of K.S.A. 2015 Supp. 66-2008(e)(2). Rather, Twin Valley argues treating the lost subsidy as a revenue source would have untoward effects for other purposes such as evaluating

5

any rate adjustments the company might seek. Superficially, Twin Valley's argument seems to rest on a valid premise—counting what is actually a loss of revenue as a receipt of revenue would have a distorting effect on the company's overall financial picture. But the argument is irrelevant. The narrow issue here is whether Twin Valley should receive an additional payment from the KUSF to replace the now-missing High Cost Loop subsidy. The KCC's accounting tool appears to be an acceptable way to look at that precise determination in conformity with K.S.A. 2015 Supp. 66-2008(e)(2). This court so recognized in *Moundridge Telephone Co.*, 2015 WL 7693784, at *12.

Accounting devices and number crunching aside, K.S.A. 2015 Supp. 66-2008(e)(2) represents a clear legislative directive precluding exactly what Twin Valley wants here—more from the KUSF because it is getting less from the federal government. The legislature has made an unmistakable policy choice that the KCC and this court must respect. The KCC has done so, and we do likewise. Our reading of K.S.A. 2015 Supp. 66-2008(e)(2) squares with this court's conclusion in *Moundridge Telephone Co.* The court found that the KCC correctly deployed the same accounting device in that case "to ensure KUSF support is not used to offset Moundridge's loss of federal HCL support[,]" thereby conforming to dictates of K.S.A. 2015 Supp. 66-2008(e)(2). *Moundridge Telephone Co.*, 2015 WL 7693784, at *13. We agree and, therefore, reject Twin Valley's point.

Twin Valley next argues that the KCC's approach denies the company any opportunity to recover the lost federal subsidy from any source in contravention of its right to a reasonable rate of return for its investors as a telecommunications carrier regulated in the public interest. We have touched on this point already. Twin Valley's argument rests on a faulty premise—that the KCC's accounting tool in treating the lost High Cost Loop subsidy as revenue would be applied outside of the narrow circumstance presented here. We do not understand that to be the KCC's position. Even if it were, however, we fail to see how Twin Valley necessarily would be entitled to relief in this

6

case. The tool has been properly applied here, as we have explained and as our colleagues found in *Moundridge Telephone Co.*, 2015 WL 7693784, at *13. Were the KCC to treat the loss of High Cost Loop subsidies as revenue in some other case, say a requested rate increase from Twin Valley, the argument the company now raises would be joined in a concreted, defined legal dispute. In the context before us, however, it is little more than a hypothetical.

To address Twin Valley's request for an increased allocation from the KUSF in this case, the KCC treated the lost federal subsidy in a way that adheres to the directive in K.S.A. 2015 Supp. 66-2008(e)(2). Although the same treatment *might* be inappropriate in determining some other sort of request from Twin Valley, the company offers nothing more than that abstract legal proposition as a basis for relief from the KCC order. Twin Valley can't prevail on the grounds that an accounting tool correctly applied in this case could be inaptly applied to an entirely different set of legal and factual circumstances.

Twin Valley seems to recognize the manifest flaw in that position and offers no distinct argument for the point. Rather, the company simply identifies the issue and argues it as an adjunct to the third and final point on appeal: The KCC's denial of the increased KUSF subsidy amounts to a taking of property without just compensation in violation of the Fifth Amendment to the United States Constitution. We now turn to that constitutional argument.

The Fifth Amendment, among other things, precludes the federal government from taking private property without paying the owners a fair price for their loss. See *United States v. Causby*, 328 U.S. 256, 261-62, 66 S. Ct. 1062, 90 L. Ed. 1206 (1946); *American Exp. Travel v. Sidamon-Eristoff*, 669 F.3d 359, 370 (3d Cir. 2012). The protections of the Takings Clause have been incorporated through the Fourteenth Amendment to the United States Constitution and, therefore, apply to the actions of state and local government entities. See *Palazzolo v. Rhode Island*, 533 U.S. 606, 617, 121 S. Ct. 2448, 150 L. Ed.

7

2d 592 (2001). The Takings Clause commonly applies to the government's physical appropriation of privately owned real or personal property for public use, such as the condemnation of farmland for a highway. But government regulation of privately owned utilities and other businesses operating in the public interest may diminish their value to a degree creating a constitutionally compensable taking. See *Duquesne Light Co. v. Barasch*, 488 U.S. 299, 307-08, 109 S. Ct. 609, 102 L. Ed. 2d 646 (1989); *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 488-90, 720 P.2d 1063 (1986); *Kansas City Power & Light Co.*, 52 Kan. App. 2d at 542-44. The parties acknowledge those signposts.

Utility regulation, however, reflects a distinct and sometimes arcane application of Fifth Amendment takings jurisprudence. See *Duquesne Light Co.*, 488 U.S. at 307 (The "partly public, partly private status of utility property creates its own set of questions under the Takings Clause of the Fifth Amendment."). Against this background, Twin Valley's briefing on this score seems imprecise and fails to present an especially focused contention. The KCC grapples with what amounts to an abstract proposition and presents a similarly disengaged response.

As we size up the constitutional issue, Twin Valley argues for a compensable taking of its property because its investors will receive an inadequate rate of return without the increased KUSF subsidy. For purposes of this case, the parties agree (or at least don't dispute) that 7.26% would be a reasonable rate of return for Twin Valley's investors during the relevant time. Twin Valley offered expert testimony that the denial of its request for an additional KUSF subsidy of $856,627 would yield a 4.64% rate of return. The KCC staff did not directly dispute that calculation. Twin Valley contends the reduced rate of return amounts to a constitutional taking of its property without compensation. In other words, as we understand the claim, Twin Valley says the investors effectively have been forced to dedicate the company's property (and their investment) to a public purpose without fair recompense.

8

We put aside some potential and perhaps only superficial weaknesses in Twin Valley's argument. First, we assume that the KCC's refusal to allow an increased *subsidy* amounts to a taking of Twin Valley's property for constitutional purposes. But we aren't convinced of the underlying legal premise that the agency's rejection of a greater subsidy should be treated in the same fashion as, for example, a forced reduction in prices charged the company's customers or even the denial of a requested price increase. Subsidies look to be of a different character than revenues derived from actual sales or other business operations. Moreover, the precipitating action here was the federal government's decision to cut existing High Cost Loop subsidies, suggesting any ostensible takings claim ought to be directed at that decision rather than at the KCC's order.

Second, we assume Twin Valley could not enhance its rate of return to investors by cutting costs or by increasing prices. The record appears to be silent as to manageable cost cutting, and Twin Valley has speculated that a price increase would prompt many customers to seek alternative telecommunications services, presumably from wireless providers. We question whether the denial of a subsidy could be considered a constitutional taking without direct, substantive evidence—if only in the form of well-grounded expert testimony—that alternative business practices to either cut costs or increase revenues would be ineffective in achieving a reasonable rate of return for investors.

Even discarding those considerations, Twin Valley's approach remains constitutionally infirm. Twin Valley essentially argues that a KCC order resulting in any rate of return for a regulated business less than what has been determined to be "the reasonable rate" amounts to a compensable constitutional taking. That broadly framed argument is legally untenable, and we reject it. Twin Valley has *not* argued that the difference between the reasonable rate of return defined in this case and the lower rate of

9

return the company will realize without the enhanced KUSF subsidy is of such a magnitude as to create a government taking. Nor has Twin Valley advanced some legal test or economic formula for determining when a deviation from an established rate of return amounts to a taking requiring compensation. So Twin Valley effectively says any shortfall between the projected actual rate of return and the determined reasonable rate of return violates the Takings Clause.

Without acknowledging as much, Twin Valley asks for a new rule to establish regulatory takings in the context of government orders affecting utilities and other private businesses operated in the public interest. Twin Valley cites no case authority supporting either that rule or a government taking requiring compensation in circumstances similar to those presented here.

The settled legal standard permits a fair amount of economic play in establishing a constitutionally acceptable rate of return for a private company operating in an industry regulated in the public interest. And the standard tolerates rates of return that at least periodically fall measurably short of a predetermined reasonable rate without finding a constitutional deprivation. In *Duquesne Light Co.*, the United States Supreme Court briefly surveyed nearly a century of regulatory law and reiterated the settled principle that "the Constitution protects utilities from being limited to a charge for their property serving the public which is so 'unjust' as to be confiscatory." 488 U.S. at 307. The Court cited what it characterized as the landmark decision in *Power Comm'n v. Hope Natural Gas Co.*, 320 U.S. 591, 602, 605, 64 S. Ct. 281, 88 L. Ed. 333 (1944), for the proposition that the United States Constitution prescribes no particular method for determining reasonable rates for public utilities, thus supporting the principle that there is a "constitutional range of reasonableness" within which state regulatory agencies may act. *Duquesne Light Co.*, 488 U.S. at 310, 312.

10

In *Hope*, the Court recognized that the "end result" of the governmental regulatory process cannot be "unjust and unreasonable" from the perspective of the regulated company or its investors. 320 U.S. at 603. Consistent with *Hope*, the Court has since declared: "All that is protected against, in a constitutional sense, is that the rates fixed by the [government] be higher than a confiscatory level." *FPC v. Texaco, Inc.*, 417 U.S. 380, 391-92, 94 S. Ct. 2315, 41 L. Ed. 2d 141 (1974). And that a rate within a "broad zone of reasonableness" conforming to otherwise appropriate regulations will not be considered confiscatory in the face of a constitutional challenge. *Permian Basin Area Rate Cases*, 390 U.S. 747, 770, 88 S. Ct. 1344, 20 L. Ed. 2d 312 (1968).

The Kansas Supreme Court, not surprisingly, has expressly embraced those constitutional principles in evaluating KCC orders. *Kansas Gas and Electric Co.*, 239 Kan. at 488-91. The court emphasized the zone-of-reasonableness consideration in explaining judicial review of those orders for constitutional sufficiency. 239 Kan. at 488-91. As the decision notes, 239 Kan. at 490-91, the Kansas Supreme Court had outlined the mandate for rate-making review in much the same way 13 years earlier:

> "There is an elusive range of reasonableness in calculating a fair rate of return. A court can only concern itself with the question as to whether a rate is so unreasonably low or so unreasonably high as to be unlawful. The in-between point, where the rate is most fair to the utility and its customers, is a matter for the State Corporation Commission's determination." *Southwestern Bell Tel. Co.*, 192 Kan. 39, Syl. ¶ 17.

That remains the benchmark. See *Moundridge Telephone Co.*, 2015 WL 7693784, at *26.

Measured against that benchmark, Twin Valley's constitutional takings argument comes up short. As we have said, Twin Valley has simply argued that anything less than the determined "reasonable rate" amounts to a constitutional taking demanding just compensation. But the law is otherwise. The Takings Clause does not require an exact match but a rate of return within a range of reasonableness. A rate of return must be so

11

low—outside that reasonable range—as to be confiscatory to trigger constitutional relief. Twin Valley has not shown that a 4.64% rate of return for the relevant time period to be unreasonable or confiscatory given the circumstances of this case and the administrative record.

Affirmed.