931 F.2d 948
 289 U.S.App.D.C. 310
 WILLISTON BASIN INTERSTATE PIPELINE COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Colorado Interstate Gas Company, K.N. Energy, Inc., Montana
Consumer Counsel, et al., Intervenors.
 No. 90-1205.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Feb. 14, 1991.
Decided April 30, 1991.
As Amended April 30, 1991.
 
 Petition for Review of an Order of the Federal Energy Regulatory Commission.
 Robert T. Hall, III, New York City, with whom Stephen L. Huntoon, Randall V. Griffin, Washington, D.C., and Paul K. Sandness, Bismark, N.D., were on the brief, for petitioner.
 Joel M. Cockrell, Atty., F.E.R.C., with whom William S. Scherman, General Counsel, and Jerome M. Feit, Sol., F.E.R.C., were on the brief, Washington, D.C., for respondent.
 Alan J. Roth, with whom Cynthia S. Bogorad, Rise J. Peters, Washington, D.C., Robert Nelson, Robin McHugh, Helena, Mont., and Douglas Eidahl, Pierre, S.D., were on the brief, for intervenors Montana Consumer Counsel, Montana Public Service Com'n and Public Utilities Com'n of South Dakota.
 James Howard, Washington, D.C., entered an appearance for intervenor Colorado State Gas.
 Carl W. Ulrich, Washington, D.C., entered an appearance for intervenor K.N. Energy, Inc.
 Before RUTH BADER GINSBURG, WILLIAMS and D.H. GINSBURG, Circuit Judges.
 Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.
 STEPHEN F. WILLIAMS, Circuit Judge:
 
 
 1
 When a natural gas pipeline company extends its facilities to a producing field, the resources committed to the field are uniquely valuable there; the pipeline is therefore dependent on the producers' continued willingness to sell. By the same token, as gradual depletion of the field diminishes the producers' bargaining power with alternative gas purchasers or transporters, the producers are dependent on the pipeline. The solution to this relation of mutual dependency is a long-term contract. See, e.g., Oliver E. Williamson, Transaction-Cost Economics: The Governance of Contractual Relations, 22 J.L. & Econ. 233 (1979).
 
 
 2
 The usual contract includes a "take-or-pay" provision, under which the pipeline agrees to buy a specified percentage of a producer's deliverable gas in each period, or, in the alternative, to pay for that quantity of gas as if taken, in exchange for the producer's commitment of the gas. Cf. ANR Pipeline Co. v. Wagner & Brown, 44 FERC p 61,057 at 61,155 (1988). Such contracts typically soften the obligation to pay without taking by allowing the pipeline a chance to "make up" the "prepaid" volumes in a later period.
 
 
 3
 If customer demand for the pipeline's gas falls, whether because of recession, conservation, a fall in the price of a substitute such as oil, or an increased supply of gas (all of which occurred in the early 1980s), these contracts can put the pipeline in a bind, especially if the price terms of the contracts are rigid. The pipeline is put to the choice of incurring take-or-pay liability (with the concomitant possibility of never being able to make up the prepaid gas) or taking "excess" gas into storage for later sale. Because the Commission appears to have given far less favorable treatment to payments made to take gas into storage for later use than to prepayments made for a mere future chance to take gas, without a reasoned justification, we vacate the Commission's orders and remand the case for reconsideration of the issue.
 
 
 4
 * Effective January 1, 1985, Montana-Dakota Utilities Company split its local distribution facilities from its interstate gas pipeline facilities and transferred the latter to a new creation, Williston Basin Interstate Pipeline Company. See Williston Basin Interstate Pipeline Co., 30 FERC p 61,143 (1985) (approving settlement agreement that provided for division and transfer). The Federal Energy Regulatory Commission approved interim rates for Williston, subject to refund. Id. at 61,254. The Commission reserved decision on whether Williston could include in its rate base (and thus earn a return on) the cost of 14.4 billion cubic feet of gas purchased in 1983 and injected into a gas storage field. Id.
 
 
 5
 An Administrative Law Judge allowed inclusion of the cost of this gas (generally called "the 1983 net storage injections"). Williston Basin Interstate Pipeline Co., 35 FERC p 63,064 (1986) ("Initial Decision"). He regarded the controlling test as whether the expenditures were prudent, and he found that they were. He reasoned that the available alternatives, take-or-pay prepayments or the legal liability associated with contract breach, were "no more attractive". Id. at 65,220.
 
 
 6
 In Opinion No. 331, Williston Basin Interstate Pipeline Co., 48 FERC p 61,137 (1989), the Commission agreed that Williston's predecessor was prudent in buying the gas and making the storage injections. Id. at 61,535. But it denied inclusion in the rate base. First, it held that inclusion required a finding that the stored gas is "used and useful" to Williston's ratepayers to justify its earning a return. Id. at 61,537. Then it held that the 1983 net storage injections are not used and useful, rejecting Williston's arguments that the stored gas provided necessary peak day "deliverability" and resulted in lower rates to consumers by avoiding legal liability for breach of contract. Id. at 61,538-41.
 
 
 7
 Williston sought rehearing, arguing (1) that stored gas is working capital not subject to the "used and useful" standard, and (2) that the 1983 investment is indistinguishable from take-or-pay prepayments that the Commission would have readily included in the rate base. The Commission stuck to its guns. Opinion No. 331-A, Williston Basin Interstate Pipeline Co., 50 FERC p 61,420 (1990).
 
 
 8
 We agree that the Commission failed to provide a reasoned distinction between take-or-pay prepayments and the 1983 net storage injections that justifies different rate base treatment. See, e.g., Greater Boston Television Corp. v. FCC, 444 F.2d 841, 851-52 (D.C.Cir.1970). Further, every trace of agency thinking that we can uncover indicates either that the Commission does not require take-or-pay prepayments to be "used and useful" or that it views them as satisfying that condition under far looser terms than it applied to Williston's 1983 investment in stored gas. Accordingly, we vacate and remand to the Commission to reconsider its handling of the 1983 net storage injections.[1]II
 
 
 9
 As early as 1980 the Commission found that every major interstate natural gas pipeline was suffering from an oversupply of gas. See, e.g., Order No. 30-D, Transportation Certificates for Natural Gas for the Displacement of Fuel Oil, FERC Statutes and Regulations 1977-1981 p 30,184, at 31,280 (1980). Moreover, because virtually everyone in the industry had believed that prices would soar, gas purchase contracts provided for high prices that by the early 1980s proved hard for the pipelines to pass on to their customers. Williston's predecessor (which we will simply call Williston) was no exception. Indeed, to make matters worse, nearly 50% of its sales were to two other interstate pipeline companies under long-term contracts. Williston believed that these contracts provided for firm purchases, but when the buyers responded to the nationwide surplus by ending contract purchases, the Commission held otherwise. See Montana-Dakota Utilities Co., 23 FERC p 61,418, reh'g denied, 25 FERC p 61,330 (1983).
 
 
 10
 Williston responded by reducing purchases, cutting them by February 1983 to 56% of 1982 levels and prorating the cuts among all suppliers. Opinion No. 331, 48 FERC at 61,528. As the Commission noted, any further reduction "could have resulted in $150 million in accrued take-or-pay liability." Id. at 61,536. In addition, Williston addressed the special difficulties of its many suppliers who produce "associated gas" from oil wells, and who, if unable to dispose of their gas, must cut back valuable oil production as well. Such producers were naturally especially likely to sue. See Initial Decision, 35 FERC at 65,219. To accommodate them, Williston offered to take the "excess" gas without paying for it, and to store it on behalf of the producers for later transportation to such purchasers as the producers might find. Id. at 65,221.
 
 
 11
 The combined strategy enabled Williston to preserve good relations with producers and thus renegotiate the underlying gas purchase contracts. By 1985 it had done so, reducing the price of almost all of its major contracts to market-clearing levels (and thus achieving a $27 million annual saving in gas purchase costs for its customers), while retaining the long-term supplies of gas. See Initial Decision, 35 FERC at 65,219-20. In addition, the settling producers agreed to waive accrued take-or-pay liability, estimated at approximately $200 million. Id. at 65,220.
 
 
 12
 In Opinion No. 331, the Commission endorsed Williston's strategy: "It is reasonable to conclude, as Williston did, that incurring the storage costs and avoiding the litigation costs was its least-cost alternative." See 48 FERC at 61,536. Williston seeks more than a pat on the back, however. It asserts that if it had made prepayments, it would have been rewarded by the Commission's allowing it to include those amounts in its rate base. It further asserts that the Commission has not provided a reasoned explanation for disallowing inclusion of the 1983 net storage injections--in many respects the functional equivalent of take-or-pay prepayments (though from the customers' viewpoint evidently more frugal even if included in the rate base). After looking at the Commission's past treatment of take-or-pay prepayments and its discussions here, we agree.
 
 
 13
 Since at least 1964, the Commission has consistently allowed pipelines to earn a rate of return on take-or-pay prepayments by including them in the rate base. See United Gas Pipe Line Co., 31 FPC 1180, 1192 (1964). As the Commission recently stated:
 
 
 14
 [A]ll prepayments are considered as a rate base item. These are amounts spent for which a service will be provided in the future. The Commission's rate treatment of all prepaid items is to include them as part of the rate base, thus earning a rate of return and related income taxes. Gas prepayments are treated no differently, and there is no good reason to change this policy.
 
 
 15
 Tennessee Gas Pipeline Co., 42 FERC p 61,175, p. 61,628 (1988) (emphasis added). Logically enough, the Commission regards the carrying charges on these prepayments as a cost of "holding gas inventory". Northwest Pipeline Corp., 53 FERC p 61,253 at 62,022 (1990). For other decisions explicitly upholding rate base inclusion, see Arkla Energy Resources, 49 FERC p 61,103 at 61,461-62 (1989); Arkla Energy Resources, 43 FERC p 61,302 at 61,829 (1988); Statement of Policy and Interpretative Rule, FERC Statutes and Regulations, Regulations Preambles 1982-1985 p 30,637 at 31,301 (1985); Accounting and Rate Treatment of Advances, 55 FPC 803, 806 (1976); Northwest Pipeline Corp., 43 FERC p 61,263 (1988).
 
 
 16
 Literally billions of dollars of prepayments have received rate base treatment over the last decade. By the end of 1983, the year that Williston experienced the take-or-pay difficulties that led to the 1983 net storage injections, approximately $1 billion worth of prepayments were earning carrying charges in pipeline rate bases. See Statement of Policy and Interpretative Rule, FERC Statutes and Regulations, Regulations Preambles 1982-1985 p 30,637, p. 31,301 (1985). In fact, Williston's own rate base includes take-or-pay prepayments, in accordance with "current Commission policy". See Williston Basin Interstate Pipeline Co., 53 FERC p 63,009 at 65,068 (1990).
 
 
 17
 FERC appears to have insisted on only two prerequisites to inclusion of take-or-pay prepayments in the rate base: (1) the pipeline's decision to enter the contract must have been prudent (as the Commission has found as to Williston's contracts, see Opinion No. 331, 48 FERC at 61,529-32[2]) and (2) at the time of inclusion there must be a mathematical possibility of make-up (no matter how slim the actual probability). Prepayments are removed from the rate base only when they are recouped by the pipeline's taking the gas (and thus recovering the payments as part of the cost of gas sold), or when they slip beyond any possibility of make-up.[3] See ANR Pipeline Co. v. Wagner & Brown, 44 FERC p 61,057, p. 61,157 (1988); 18 CFR Part 201, Account 165 (1990); Texas Eastern Transmission Corp., 22 FERC p 61,335, p. 61,581 (1983); Southern Natural Gas Co., 41 FERC p 63,030, p. 65,195 (1987). In a striking commentary on its hospitality toward take-or-pay prepayments, the Commission told a House subcommittee in 1985 that it was unaware of any instance where it had disallowed inclusion in the rate base. See Letter from Commission Chairman Raymond O'Connor to Rep. John Dingell (Chairman, Subcommittee on Oversight and Investigations, Committee on Energy and Commerce) (April 15, 1985, Question 3(c)-2) (on file at the Commission).
 
 
 18
 Thus, if Williston had paid for the gas but not taken it, it appears that the Commission would have allowed inclusion of the prepayments in the rate base. Both prepayments and payments for gas taken and stored are methods of complying with long-term gas purchase contracts. The only differences are these: (1) The 1983 net storage injections are stored in the pipeline's storage field, not the producing field, which is surely irrelevant. (2) The 1983 net storage injections are held without risk of forfeiture, while gas paid for but not taken is subject to forfeiture if the pipeline is unable to make-up the prepaid volumes during the contractual make-up period. From the viewpoint of customer advantage, this latter distinction seems to cut in favor of purchase and storage. If prepayments establish an asset suitable for rate base inclusion, it is difficult to see why similar payments for a more secure asset do not.
 
 
 19
 In fact, stored excess gas and take-or-pay prepayments are so similar that a pipeline may readily transform one into the other. Thus, should the Commission ultimately give prepayments favored rate base treatment, a pipeline with stored volumes could immediately sell the stored gas to its customers, reducing takes of new gas and making take-or-pay prepayments (to avoid contract breach). If the Commission should instead favor stored gas, a pipeline with prepayments could take 100% of the deliverable gas from its suppliers' wells until it had filled available storage space or had converted all the prepayments into stored gas.
 
 
 20
 The Commission offers several purported differences to square its disallowance of the 1983 net storage injections with its allowance of prepayments. None of them helps its case. First, in Opinion No. 331-A, it claimed the existence of a further limit on rate base treatment for take-or-pay prepayments--a requirement that the pipeline show that it would take the gas and sell it "within a reasonable amount of time".[4] See 50 FERC at 62,291. But the Commission points to no case where it ever applied such a condition, and we have found none. Perhaps the Commission means that the make-up periods fixed in gas contracts are per se reasonable. If so, a "reasonable amount of time" must be at least five years, the minimum make-up period allowed by Commission regulation since 1967. 18 CFR Sec. 154.103 (1990). In fact, the Commission cheerfully allows rate base treatment for gas prepayments under contracts providing for longer make-up periods. See, e.g., Michigan Wisconsin Pipe Line Co., 27 FPC 449, 455-57 (1962) (best case scenario did not contemplate full make-up until nearly eight years after prepayment). Moreover, where a pipeline secures an extension of the make-up period, the Commission apparently allows inclusion in the rate base beyond the initial period, so long as recoupment is still possible. See Southern Natural Gas Co., 41 FERC p 63,030 at 65,195 (1988); see also Trunkline Gas Co., 41 FERC p 63,011 at 65,028-29 (1987). If five (and more) years of carrying charges are appropriate for take-or-pay prepayments, five (and more) years are presumably appropriate for the 1983 net storage injection gas. If the Commission is concerned lest pipelines include prepayments or storage gas for "unreasonably" long periods, it can presumably address that issue in some evenhanded fashion.
 
 
 21
 The Commission also points out that many of Williston's contracts require it to take 90% to 100% of the deliverable gas each period and that a 1982 Commission policy statement prospectively denied rate base treatment for take-or-pay prepayments made under contracts requiring the pipeline to take more than 75% of deliverability. The Commission acknowledged that the policy statement would not cover prepayments made under these contracts, as it covered only contracts entered after the effective date of the policy statement, December 23, 1982, see Take or Pay Provisions in Gas Purchase Contracts; Statement of Policy, FERC Statutes and Regulations, Regulations Preambles 1982-1985 p 30,410 at 31,312 (1982), and these became effective earlier. See Opinion No. 331-A, 50 FERC at 62,291. But it argues that the policy statement "indicates the light in which 100-percent-deliverability prepayments would have been reviewed." Id. It seems more forcefully to show that the Commission was ready to grandfather all take-or-pay prepayments above the fatal percentage in pre-1983 contracts, without a hint that it was ever ready to impose retroactive penalties on take-or-pay prepayments made under high-deliverability con tracts.. Accordingly, it provides no basis for retroactively penalizing payments for stored gas deriving from such contracts.
 
 
 22
 Finally, there is much discussion in the Commission's decisions in this case about its Uniform System of Accounts, see 18 CFR Part 210 (1990). See, e.g., Opinion No. 331-A, 50 FERC p 61,420 at 62,292; id. at 62,286-88. Perhaps this appears only as a Commission response to arguments initiated by Williston. If, on the other hand, the Commission acted as it did because it could not squeeze this transaction into its existing set of accounting cubbyholes, then something is radically amiss. The Commission is free to create a new cubbyhole to account for a new situation, just as it altered Account 165 in 1968 to deal with the take-or-pay prepayment problem, see Order No. 371, Order Amending Account 165, Uniform System of Accounts, Class A and Class B Natural Gas Companies, And Form 2, Annual Report, Class A and Class B Natural Gas Companies, 40 FPC 1031 (1968); 18 CFR Part 201, Account 165 (1968); id. (1969); id. (1970), although, as we have seen, it was quite able to give prepayments rate base treatment well before. Indeed, in what appears to be the only prior analysis of the accounts problem at the Commission, an ALJ noted the identity between prepayments and stored gas and allowed carrying charges for the stored gas, simply noting that it would be "recorded in another account than Account 165." Southern Natural Gas Co., 41 FERC p 63,030 at 65,210. In any event, the accounts system is surely designed to assure rational treatment of related items; where it would thwart such rationality, one would expect, in the absence of a reasoned decision based on the importance of categorical treatment, that it rather than reason should yield.[5]
 
 
 23
 Much of the confusion in this area stems from a somewhat schizophrenic regulatory framework. On the one hand the Commission lays down a stern rule that nothing goes into the rate base that is not "used and useful to consumers," and applies that rule, as here, to insist on some physical object that is currently yielding direct services to customers. On the other hand, the Commission from time to time creates an exception, perhaps driven by concern for the effect that relentless application of the used-and-useful doctrine would have on utilities' ability to attract capital. See Jersey Cent. Power & Light Co. v. FERC, 810 F.2d 1168, 1188 (D.C.Cir.1987) (en banc) (Starr, J., concurring) (noting exceptions).[6] On other occasions it seems to apply a subtler variant of the used-and-useful requirement, in which an item's contribution to the provision of services is analyzed in terms of an economic assessment of alternatives. Take-or-pay prepayments have clearly enjoyed one or the other of these two adjustments.
 
 
 24
 The Commission in its brief and opinions here cited no case applying the used-and-useful doctrine to take-or-pay prepayments, or even discussing it, and Commission counsel could cite none at oral argument. The only references that we have been able to uncover point the other way, with ALJs (or their predecessors) reading the Commission's tea leaves to say that the doctrine does not apply. One ALJ argued, for example, that the Commission's apparent readiness to allow recovery of such prepayments under Order No. 500 made no sense if it intended to apply the used-and-useful test. Transcontinental Gas Pipe Line Corp., 41 FERC p 63,020 at 65,138 (1987); see also United Gas Pipe Line Co., 31 FPC 1222, 1239 (1963), aff'd, 31 FPC 1180, 1192 (1964).
 
 
 25
 Here, however, the Commission insists that it applies the used-and-useful test to take-or-pay prepayments, but makes clear that the application (if it occurs at all) is of the mild variety. It explains that prepayments meet the test because "[they] pay for a right to future deliveries." See Opinion No. 331-A, 50 FERC at 62,291. This of course would not satisfy the traditional test of used and useful. That test ordinarily denies rate base treatment for investments in a plant until it comes on line, see Mid-Tex Elec. Co-op, Inc. v. FERC, 773 F.2d 327, 331-32 (D.C.Cir.1985), and thus would not logically allow inclusion of payments that may not yield gas for five long years, and, indeed, may never yield a single molecule. In any event, the Commission's asserted used-and-useful test for prepayments appears to be one that the payments for the 1983 net storage injections should pass with ease.
 
 
 26
 The Commission might well recognize that certain obligations are used and useful to customers because they form part of a least-cost strategy for assuring a stable long-term gas supply. The risks associated with producer and pipeline investment in transaction-specific assets, alluded to at the start of the opinion, cannot be costless and will not go away. One way or the other, pipeline customers will bear those costs (if only in the form of gas shortages). Indeed, in justifying relaxation of its application of the used-and-useful doctrine to Construction Work in Progress, the Commission itself argued that for a variety of reasons rate base inclusion of plant investment--years before a plant came on line--would "generally allow utilities to pursue least total cost strategies to meeting their customers' electric power demands." See Mid-Tex, 773 F.2d at 334 (emphasis in original), quoting Order No. 298, 48 Fed.Reg. 24,323, 24,331 (1983). See also Cities and Villages of Bangor, et al. v. FERC, 922 F.2d 861, 863, 864 (D.C.Cir.1991) (upholding Commission's decision allowing utility to pass on payments made under minimum take provision in coal supply contracts, court notes that expenses "assure[d] the utility of a reliable fuel supply at the contract price" and that without them the supplier "would have to charge more per unit of coal actually taken"). In those terms, the Commission has yet to identify any benefits associated with prepayments that are not equally associated with the 1983 net storage injections. Of course, if the Commission decides that one form of handling the problem of long-term contracts deserves favored treatment, it will have to explain how the public interest is furthered by creating incentives against the form that the utility chose here and that the Commission characterized as "its least-cost alternative". See Opinion No. 331, 48 FERC at 61,536.
 
 
 27
 In addition to the take-or-pay prepayment analogy, Williston also argues that the 1983 net storage injection payments belong in its rate base because the gas is used and useful in providing "deliverability" during peak periods. (The extra volumes of gas in the field add pressure which results in higher peak deliverability.) We find that there is substantial record evidence in support of the Commission's conclusion that the 1983 net storage injection gas is not used and useful to Williston's customers in this fashion. Excluding the 1983 net storage injections, the storage fields controlled by Williston contain more than 230 Bcf of gas, an amount that all parties agree is more than sufficient to provide needed peak deliverability. Williston complains that it only owns 120 Bcf of that gas and has no control over the disposition of the remainder. But so long as the third-party gas remains in the field, it contributes pressure and deliverability, even though not available for sale to Williston's consumers. The Commission found, and Williston does not dispute, that it is unlikely that the third-party storage gas will be moved off-system in the near future. See Opinion No. 331-A, 50 FERC at 61,539-40; Joint Appendix 498-99. Should circumstances undermine that finding, Williston would be free (if the Commission's reconsideration of the relation with take-or-pay prepayments went against it) to make a new rate filing or otherwise seek inclusion of some of the 1983 net injections on the basis of their contribution to deliverability.
 
 
 28
 To sum up, the Commission must on remand reconcile its treatment of the 1983 net storage injections with its treatment of take-or-pay prepayments. If application of the used-and-useful test is key, it must reveal what variant of the doctrine applies to each, and, if they differ, why.
 
 
 29
 Accordingly, we vacate the orders below and remand the case to the Commission for its further consideration.
 
 
 30
 So ordered.
 
 
 
 [1]
 Williston is not the only party unhappy with Opinions No. 331 and 331-A. Representatives of Williston's customers (Montana Consumer Counsel, Montana Public Service Commission, and Public Utilities Commission of South Dakota) filed a separate petition for review arguing that while (in their view) the Commission rightly excluded the 1983 net storage injection costs, it misinterpreted the provisions of the settlement agreement as to the value to be excluded. (The effect of the valuation decision was to reduce the impact of the rate base exclusion on Williston by as much as 85% of the disputed value.) That petition, No. 90-1177, was consolidated with Williston's related petition for review, No. 90-1205. Because the issue in No. 90-1177 would be mooted by a Commission finding on remand that the 1983 net storage injection investment should be included in Williston's rate base, we hold No. 90-1177 in abeyance pending the Commission's decision on remand in No. 90-1205
 
 
 [2]
 A pipeline's recovery of the cost of gas purchased at a price no higher than the maximum lawful price provided by the Natural Gas Policy Act is evidently denied only if the costs are excessive "due to fraud, abuse, or similar grounds". NGPA Sec. 601(c)(2), 15 U.S.C. Sec. 3431(c)(2) (1988); see also Office of Consumers' Counsel v. FERC, 914 F.2d 290, 292, 295 (D.C.Cir.1990). In the cited passages, however, the Commission went on to find that Williston's gas purchasing practices were not "imprudent"
 
 
 [3]
 There will be cases where, even though the make-up period has not expired, one can tell that a certain portion of the prepayments can never be made up. This occurs where the volume of paid for but untaken gas is great, the fraction of deliverable production which the contract requires the pipeline to take before it can take make-up gas is high, and the make-up time is short. An ALJ has noted the possibility of excluding prepayments from the rate base in these circumstances, see Southern Natural Gas Co., 41 FERC p 63,030 at 65,195 (1987), but apparently the Commission has never actually done so
 
 
 [4]
 In its brief, the Commission purports in addition to base its treatment of take-or-pay prepayments on "the central assumption ... that the pipeline will ultimately take the gas and sell it." Brief for Commission at 26 (emphasis in original). This requirement is by definition subsumed in a requirement that the gas be taken in a reasonable time. In any event, unless there are special reasons for Williston to maintain high storage levels, independent of the 1983 market conditions, it will ultimately sell the 1983 net storage injection gas (or its equivalent) to its customers; the only question is when
 
 
 [5]
 Of course the same reasoning applies to efforts by Williston to manipulate the Uniform System of Accounts. Thus, the 1983 net storage injections do not magically become "working capital" automatically included in the rate base simply because the Uniform System of Accounts generally classifies stored gas as such. We agree with the Commission that "Williston's attempt to classify [the 1983 net storage injections] under the working capital umbrella, undermines the traditional purposes for which working capital is allowed", see Commission Brief at 24, namely, to deal with conventional short-term lags between payment of expenses and recoupment through revenues. On the other hand, the Commission has on occasion hinted, without explanation, that take-or-pay prepayments are "working capital". See United Gas Pipe Line Co., 31 FPC 1180, 1192 (1964). To the extent that the Commission does premise rate base inclusion of prepayments on some expanded notion of working capital, we fail to see why it should not do the same for the functionally equivalent 1983 net storage injections
 
 
 [6]
 The Supreme Court's recent decision upholding application of the "used and useful" test, Duquesne Light Co. v. Barasch, 488 U.S. 299, 312, 109 S.Ct. 609, 618, 102 L.Ed.2d 646 (1989), assumed that regulators would use the rate of return to compensate utilities for the additional risk that follows from denying recovery for prudent investments. The process of calculating this risk premium may turn out to be quite complicated, however. See A. Lawrence Kolbe & William B. Tye, The Duquesne Opinion: How Much "Hope" Is There for Investors in Regulated Firms?, 8 Yale J. on Reg. 113 (1991)