Basimah R. ABDULAH, National Association of Black Americans, Richard P. Howe as Mayor of the City of Lowell, and Town of Hull, Plaintiffs,

v.

COMMISSIONER OF INSURANCE Of the COMMONWEALTH OF MASSA-CHUSETTS and Automobile Insurers Bureau of Massachusetts, Defendants.

Civ. A. No. 94–12396–NG.

United States District Court,
D. Massachusetts.

Oct. 27, 1995.

Michael Savage, Office of Michael Savage, Scituate, MA, Jack E. Robinson, New York City, for Basimah R. Abdulah.

Daniel R. Wojcik, Assistant City Solicitor, City Hall Law Department, Lowell, MA, for Richard P. Howe.

James B. Lampke, Town Counsel—Town of Hull, Hingham, MA, for Town of Hull.

Jack E. Robinson, Stamford, CT, for National Association of Black Americans, National Association of Railroad Passengers.

Judith Fabricant, Attorney General's Office, Boston, MA, for Commissioner of Insurance for Commonwealth of Massachusetts, Automobile Insurers, Automobile Insurers Bureau of Massachusetts.

E. Michael Sloman, Meyer, Connolly & Sloman, Boston, MA, for Automobile Insurers, Automobile Insurers Bureau of Massachusetts.

## MEMORANDUM AND DECISION

GERTNER, District Judge.

### I. INTRODUCTION

The plaintiffs [1] in this action seek declaratory and injunctive relief against the Massachusetts Commissioner of Insurance ("the Commissioner") with respect to the method by which the Commissioner sets motor vehicle insurance rates.[2] The plaintiffs allege that the Commissioner's method, which relies in part on a territorial rating scheme, violates both the Equal Protection and Due Process Clauses of the 14th Amendment of the United States Constitution.[3] In particular, plaintiffs allege that the statute, M.G.L. c. 175E § 4(d), requiring the Commissioner to use a territorial rating system, is invalid *on its face* because it necessarily results in the creation of a classification scheme which is not rationally related to a legitimate governmental purpose, and because it results in a confiscation of property without just compensation.

While plaintiffs raise interesting policy questions, the complaint is framed so narrowly that I cannot, on this record, find a violation of the Constitution.[4] For the reasons stated below, defendants' motion for summary judgment is **ALLOWED** and plaintiffs' motion for summary judgment is **DENIED**.[5]

### II. FACTUAL AND STATUTORY BACKGROUND

The parties have stipulated to all relevant facts in this case. They are as follows:

Since as early as 1927, the Commissioner has been statutorily authorized to set "fair, just, reasonable and nondiscriminatory" rates

---

1. This action was originally filed by plaintiff Basimah R. Abdulah on December 2, 1994. On October 6, 1995, plaintiffs National Association of Black Americans, Richard P. Howe and Town of Hull were granted leave to intervene as plaintiffs, but have not filed memoranda of law with respect to the instant motions.

2. The Automobile Insurers Bureau of Massachusetts, which represents the insurance industry in rate-setting hearings before the Commissioner, has intervened as a party-defendant.

3. Under the Commissioner's rating scheme, a "standard package" of automobile insurance in 1994 cost $2,142.11 for a resident of Roxbury (where the plaintiff resides) and $824.01 for a similarly situated resident of Wellesley, which had among the lowest territorial based ratings in the Commonwealth.

4. Plaintiffs specifically disavow any claim that the challenged law should be subjected to strict scrutiny, either because it discriminates on the basis of a suspect classification (such as race), or because it implicates a fundamental constitutional right (such as the right to travel). Plaintiffs do not contend that the Commissioner's territorial system is invalid because it results in higher rates for poor urban areas than for wealthy suburban towns, although this appears to be the case. Neither do plaintiffs contend that the Commissioner's scheme is invalid because it results in higher rates for racial minorities, although this would appear to be the case as well. Plaintiffs have framed the issues in this case quite narrowly, and the Court's inquiry is limited to the claims actually before it.

5. Plaintiff Abdulah filed a motion for summary judgment. Plaintiffs Howe and Town of Hull have not filed motions for summary judgment.

for certain types of automobile insurance coverage in Massachusetts. *See* M.G.L. c. 175 § 113B. Prior to 1977, the Commissioner was required annually to set rates for all forms of automobile insurance. In 1977, the Commissioner's authority to set rates was abolished, and insurance companies were permitted to set their own rates, subject to the Commissioner's approval. This change resulted in significant rate increases; the law was amended in 1977 to permit the Commissioner once again to set rates annually, following her or his determination that competition is insufficient or unworkable as a rate-setting mechanism. *See* M.G.L. c. 175 § 113B, M.G.L. c. 175E § 5. The Commissioner has, pursuant to this authority, made such determinations annually and established rates for non-commercial automobile insurance in every year following 1977.

The Commissioner sets rates by categorizing vehicle owners by the risk factors they are deemed to possess. Risk factors are characteristics of owners or their vehicles which have been statistically correlated with higher or lower frequencies of insurance claims. Vehicle owners whose risk factors indicate a higher than average likelihood that they will make a claim are charged higher than average rates. Conversely, vehicle owners whose risk factors indicate a lower than average likelihood of making a claim pay less.

It is, of course, possible to conceive of an infinite number of potential risk factors, since there is likely to be some correlation (even if slight) between claim frequency and any number of characteristics of insureds or their vehicles. In determining what risk factors may properly be considered in her or his rate-setting process, however, the Commissioner is guided by statutory requirements. For example, the Commissioner is required to consider the following as relevant risk factors individual driver accident records, the installation of anti-theft devices, airbags and other safety features, the make and model of the insured vehicle, and years of driving experience. M.G.L. c. 175 § 113B. Converse-ly, the Commissioner is prohibited from considering sex, age, or marital status as risk factors. *Id.*

One of the risk factors to be considered in determining the insurance rates applicable to a particular vehicle is the locality where that vehicle is principally garaged. Pursuant to M.G.L. c. 175E § 4(d), the Commissioner is required to establish not less than 15 rating territories throughout the Commonwealth and to calculate the risk of insuring particular vehicles by taking into account the particular territory in which an insured vehicle is garaged. This law does not, however, specify a method by which the Commissioner should determine the number or boundaries of these territories.

In practice, the Commissioner has established 27 such rating territories. Of these 27 territories, 10 consist of individual neighborhoods within the City of Boston. The remaining territories consist of groups of cities and towns throughout Massachusetts which have been found by the Commissioner to have similar rates of insurance claims.[6]

Every year, the Commissioner determines a "claims index" for each rating territory by comparing the relative rate of claims in the territory with statewide averages after taking into account the territory's traffic density and the individual characteristics of drivers within the territory ("the classification mix"). An initial index is computed which equals the ratio of the territory's claims frequency to the expected frequency using statewide averages. If the territory's claim frequency is higher than the expected level, it will be assigned an index greater than one. If its frequency is below the expected level, its index will be less than one. After initial indices have been determined, they are modified slightly by a practice known as "capping and tempering," which limits the percentage by which a territory's index may vary from its previous year's index, and from the indices determined for other territories.

Once a territory's final claims index has been determined using this system, the index is used to set the insurance rates for vehicles

---

**6.** The Commissioner calculates the relative frequency of insurance claims using a regression analysis which accounts for the traffic density and the "classification mix" (i.e. the classification of drivers based on their personal characteristics) in each town.

garaged within the territory, essentially by multiplying a statewide base rate by the index. As a result of this system, the rates charged to otherwise similarly situated drivers in Massachusetts vary widely depending on where they happen to garage their vehicle. For example, in 1994, the average policy holder in Territory 2, which includes the Town of Wellesley, paid $824.01 for the "standard package" of non-commercial automobile insurance, which includes mandatory liability coverages as well as comprehensive and collision coverage. That same driver, with the same driving record, would have to pay $2,142.11 for the same coverage if she lived in Territory 22, which includes the Roxbury section of Boston. Other Boston neighborhoods do almost as poorly under this system: our hypothetical driver would pay $1,725.13 in Charlestown, $1,575.41 in South Boston, and $2,150.75 in Dorchester. A driver in Lowell would pay $1,425.28. The statewide average rate is $1,074.81.

## III. DISCUSSION

As explained above, plaintiffs make two distinct—and very narrow claims—in this action. First, plaintiffs claim that M.G.L. c. 175E § 4(d), which requires the Commissioner to implement a territorial rating scheme for motor vehicle insurance rates, facially violates the Equal Protection Clause by creating a classification that is not rationally related to a legitimate governmental purpose. In particular, they claim that the Commissioner's use of a territorial rating scheme is *per se* not rationally related to the goal of fairly allocating insurance risks, because it necessarily results in similarly situated drivers within the Commonwealth paying grossly disparate rates.

Next, plaintiffs contend that Section 4(d) necessarily results in a rating scheme which is unconstitutionally "confiscatory," presumably because it takes the property of Massachusetts drivers without due process of law. In making this claim, plaintiffs analogize the plight of vehicle owners to that of a regulated business, and rely on a line of cases prohibiting rate-setting bodies from setting rates so low as to deprive a such a business of a fair and reasonable return on its investment.

*See Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 603, 64 S.Ct. 281, 288, 88 L.Ed. 333 (1944); *Aetna Casualty & Surety Co. v. Commissioner of Insurance,* 358 Mass. 272, 281, 263 N.E.2d 698 (1970).

I will address each of these claims in turn.

### A. Whether M.G.L. c. 175E § 4(d) Creates a Classification Scheme Which is Not Rationally Related to a Legitimate Governmental Purpose

Because plaintiffs have not alleged discrimination against a suspect or quasi-suspect class nor the deprivation of a fundamental right, their Equal Protection claim can succeed only if they prove that the challenged statute bears no "rational relationship to a legitimate state purpose." *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 44, 93 S.Ct. 1278, 1302, 36 L.Ed.2d 16 (1973); *Pennell v. City of San Jose,* 485 U.S. 1, 14, 108 S.Ct. 849, 858–59, 99 L.Ed.2d 1 (1987). The Supreme Court has noted that this is an extremely low threshold of legitimacy, and serves to invalidate only "wholly arbitrary acts." *New Orleans v. Dukes,* 427 U.S. 297, 303–304, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976). Moreover, because statutes enjoy a strong presumption of validity against a "rational basis" equal protection challenge, *Heller v. Doe,* —— U.S. ——– ——, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993), the onus is on the plaintiff to "negative every conceivable basis which might support" the statute's validity. *Id.* at ——, 113 S.Ct. at 2643. Courts applying the rational basis standard must give considerable deference to legislative policy determinations and refrain from setting aside a statutory discrimination if "any state of facts reasonably may be conceived to justify it." *LCM Enterprises, Inc. v. Town of Dartmouth,* 14 F.3d 675, 679 (1st Cir.1994).

Plaintiffs contend that the geographical classification required by M.G.L. c. 175E § 4(d) violates the Equal Protection Clause because "the natural result of such a classification is that approximately 30% of the insureds in Massachusetts [i.e. those living in rating territories with above average rates], who are otherwise similarly situated with the

remaining 70% of insureds, pay more for motor vehicle insurance primarily based upon where they live." *See* Plaintiffs' Memorandum in Support of Summary Judgment Motion at 4.

█ Plaintiffs' argument is meritless for two reasons. First, this is a *facial* challenge to the statute. Thus, plaintiffs must show not only that the particular territorial rating scheme that the Commissioner has chosen is irrational, but that no territorial rating scheme could ever be created, consistent with the challenged statute, which was rationally related to a legitimate state purpose. *See Whiting v. Town of Westerly,* 942 F.2d 18, 21 (1st Cir.1991). The statute at issue here requires only that the Commissioner "establish a classification of risks which shall include a designation of not less than 15 territories." M.G.L. c. 175E § 4(d). It does not mandate any particular territories or methodology for setting territorial boundaries or rates. Plaintiffs' assertion that the statutory requirement of territorial rating, on its face, necessarily results in 30% of the insureds in the state paying more than their fair share is unsupported by any analysis of the economics of insurance or of conceivable alternative territorial rating schemes.[7]

█ Second, even on its own terms, plaintiffs' argument fails. Plaintiffs argue that the Commissioner's scheme is invalid because it is "irrational." As purported evidence of the scheme's irrationality, plaintiffs point out the fact that a territory's claims index is computed based on the frequency of all accidents and thefts involving vehicles garaged in that territory, even if those accidents or thefts occur outside the territory. But this observation begs the only relevant inquiry: whether there exists some rational relationship between the territorial rating classifications and the cost of providing insurance for vehicles within each classification.

Insurance operates to spread risk. Insureds pay insurance companies a premium based on an estimate of their statistical likelihood of making a claim. The rationale behind a territorial rating system is that the location where a vehicle is principally garaged bears some statistical relationship to the likelihood that operation of the vehicle will result in an insurance claim. This rationale does not purport to explain why this relationship exists, nor does it depend on a assertion that it is inherently more dangerous to garage a vehicle within those territories with higher claims indices. The Commissioner's rating system merely attempts to allocate the burdens of purchasing automobile insurance based on a rational estimate of the real cost of insuring different classes of drivers, based on historical experience.

Plaintiffs' observation that *some* of the risk associated with a particular vehicle is not directly related to its being operated within its rating territory cannot sustain a finding that there is absolutely no rational relationship between the location of garaging and the cost of insurance. Plaintiffs' insistence that insureds in different rating territories are *"otherwise* similarly situated" alone cannot overcome the statistical proof that the location in which one garages an insured vehicle has an impact on the likelihood of a claim being made. Based on statistical information, undisputed in this litigation, insureds in different rating territories are not similarly situated, and it is thus rational for the law to treat them differently. As the Supreme Court has stated, "[a] classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality." *Heller,* — U.S. at ——, 113 S.Ct. at 2643. The classification system here is clearly related to the state's purpose of setting price according to statistical risk. Accordingly, it does not violate the Equal Protection Clause of the 14th Amendment. *Accord Century Cab, Inc. v. Commissioner of Insurance,* 327 Mass. 652, 663, 100 N.E.2d 481 (1951).[8]

7. For example, plaintiffs never discuss whether a territorial rating scheme using fewer territories and grouping contiguous urban and suburban communities together would produce more equitable results.

8. There is a subtext to this litigation which merits a brief digression. Even a cursory examination of the results of the Commissioner's territorial rating scheme makes it abundantly clear that it works to the significant benefit of wealthy suburban towns at the expense of poorer urban

### B. Whether M.G.L. c. 175E § 4(d) Establishes "Confiscatory" Rates Within the Meaning of Takings Clause Jurisprudence

■ Both the United States and Massachusetts Constitutions prohibit the government from taking property without just compensation. U.S. Const., Amend. 5, Mass. Const., art. 10. Regulations, and in particular price setting regulations, may violate this principle if they set prices so low as to be "unjust" or "unreasonable." *Duquesne Light Company v. Barasch,* 488 U.S. 299, 310, 109 S.Ct. 609, 617, 102 L.Ed.2d 646 (1989). A rate is not unreasonably low, however, if it "enable[s] [a] company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risk assumed ..." *Id.*

Recognizing that insurance companies have, on occasion, successfully challenged the Commissioner's setting of unreasonably low insurance rates on constitutional grounds, *see, e.g. Aetna Casualty and Surety Company v. Commissioner of Insurance,* 358 Mass. 272, 263 N.E.2d 698 (1970), plaintiff contends that unreasonably high rates may also be struck down as "confiscatory." There are a number of problems with this claimed parallelism. In the first place, it completely ignores the rationale behind the doctrine of prohibiting confiscatory rates: that the capital investments of regulated business should not be appropriated for public use without just compensation. A regulated utility whose rates are set unreasonably low will have no choice but to continue to serve the public without receiving any return on its investment. Plaintiff has not explained how, under the Commissioner's scheme, her assets are being confiscated for a public purpose comparable to that of a regulated industry. Moreover plaintiff has made no attempt to identify her "investment," on the basis of which the "fair" rate of return should be calculated.

Ultimately, though, I need not address the question of whether unfairly high rates for mandatory automobile insurance coverages could ever violate the constitutional rights of vehicle owners. Again, plaintiffs' challenge to the law here is a facial one. Thus, in order to succeed, she must show not only that the currently implemented system of rates is "confiscatory," but that the "mere enactment" of any territorial rating scheme, as required by Section 4(d), constitutes a taking without just compensation. *Gilbert v. City of Cambridge,* 932 F.2d 51, 56 (1st Cir. 1991) *cert. den.* 502 U.S. 866, 112 S.Ct. 192, 116 L.Ed.2d 153 (1991). In other words, she must show that the mere existence of any system of territorially based automobile insurance rates deprives her of economically viable use of her property. *Id.* Because plaintiff has not even attempted to satisfy this requirement, her claim must fail.

areas. Roxbury, one of Massachusetts' poorest communities, has the highest automobile insurance rates in the Commonwealth, while Wellesley, one of this state's wealthiest towns, has among the lowest. Thus, the Commissioner's rating scheme has the effect of penalizing the poor for their poverty.

While it is true that the Roxbury residents are, as a class, more expensive to insure than those in Wellesley, the Commissioner's decision to use this fact as a criterion for rate setting is not compelled by the concept of "fair" insurance rates. Since the Commissioner's use of territorial rating is revenue neutral, territorial rating could be eliminated without any net loss of revenue to insurance companies. Other arguably probative risk factors, such as sex, age and race, are excluded from the Commissioner's calculation as a matter of public policy. Moreover, like these excluded risk factors, and unlike other risk factors (such as a driver's individual safety record) which the Commissioner does take account of in his or her rate setting formula, the community in which a vehicle owner lives is something over which she or he often has little control. This is particularly true in light of the persistence of racial and economic segregation in the United States generally and Massachusetts in particular. It thus strikes this Court as somewhat ludicrous that the state should choose to impose a territorial rating scheme which burdens the most economically vulnerable members of our society in the name of "fairness."

Of course, courts reviewing the legitimacy of legislation under "rational basis" scrutiny are instructed not to second guess the wisdom of legislative determinations of fairness. Since any system for setting insurance rates (including a system which leaves rate setting to market forces) will tend to benefit certain classes of insureds at the expense of others, it is hard to see how any risk-based classification system would fail rational basis scrutiny absent evidence of an invidious, discriminatory purpose. Since plaintiffs have, by stipulation, foreclosed any question of heightened scrutiny of the challenged law, my inquiry must end here.

## IV. CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is **ALLOWED** and plaintiffs' motion for summary judgment is **DENIED.**

**SO ORDERED.**